415 P.2d 685

**STATE of Idaho, Plaintiff-Respondent,**

**v.**

**John Dee LARSEN, Defendant-Appellant.**

**No. 9645.**

Supreme Court of Idaho.

June 14, 1966.

Rehearing Denied July 13, 1966.

Black & Black, Pocatello, for appellant.

Allan G. Shepard, Atty. Gen., M. Allyn Dingel, Jr., Asst. Atty. Gen., Boise, and Hugh C. Maguire, Jr., Pros. Atty., Pocatello, for respondent.

McQUADE, Justice.

In 1964 appellant John Dee Larsen was convicted of murder in the first degree for the 1962 slaying of Vicki Jo Quinn near Pocatello, for which crime he was convicted and sentenced to life imprisonment. From the judgment of conviction, Larsen appeals.

■ Appellant assigns error to the trial court's denial of his motion to dismiss at the close of the State's case because the testimony of the prosecution's chief witness, Richard Burt, was "fantastic and incredible and could not be believed." Appellant cites numerous alleged inconsistencies and contradictions in Burt's testimony and claims that Burt's testimony was contradicted by, and in conflict with, other facts adduced at the trial. We have long held that:

> "It is within the province of the jury to believe or disbelieve the testimony of any witness, or any portion of such testimony, since the jury are the exclusive judges of his credibility. I.C., § 9–201; State v. Cacavas, 55 Idaho 538, 44 P.2d 1110, and authorities therein cited; State v. Hansen, 67 Idaho 359, 181 P.2d 192; State v. Davis, 69 Idaho 270, 206 P.2d 271." State v. Johnson, 77 Idaho 1, 8, 287 P.2d 425, 429, 51 A.L.R.2d 1386 (1955).

The trial court correctly denied appellant's motion to dismiss.

■ Appellant also assigns error to the introduction of certain allegedly incriminating statements made by him. In March 1964, pursuant to a warrant, appellant was arrested in Las Vegas, Nevada. Two Idaho law enforcement officials, Sheriff Parker and Deputy Sheriff Aikens, drove to Las Vegas for the purpose of returning Larsen to Pocatello. Before reaching Las Vegas the heater in the automobile ceased to operate. They sought repairs at Las Vegas and the defective heater apparently was remedied. On the evening of March 17th the sheriffs arrived in Las Vegas and visited Larsen in jail. At that time Sheriff Parker knew that Larsen previously had been represented by counsel and asked him if he had spoken to his attorney, to which Larsen replied that he had not, but that

his wife had contacted his parents and Larsen assumed that they had spoken with his attorney. Sheriff Parker stated the only mention of an attorney during that evening was his question to Larsen. Larsen testified that the sheriffs asked him to make a statement but that he told them he would rather talk to this attorney before saying anything. Larsen does not complain that he was denied an opportunity to telephone his attorney that evening from the Las Vegas jail.

The following day, March 18th, Larsen and the two sheriffs began their return trip to Pocatello. Larsen, who was handcuffed and chained, sat on the rear seat of the car. The two sheriffs sat on the front seat. Shortly after departing Las Vegas the heater again refused to function properly and during the remainder of the trip of approximately nine hours, the car was without heat. There was evidence that for a considerable portion of the trip the weather was cold, but not to the point of being unbearable. During the trip they stopped on two occasions to eat. On one occasion Larsen had a hamburger. On the other occasion he had a cup of coffee and a doughnut. He went to the restroom once. Larsen made no other requests for the re-mainder of the trip. The sheriffs had advised Larsen at the outset of the trip that if he was hungry or had to take care of any needs, he should inform them and they would stop at the first opportunity.

During the trip from Las Vegas to Pocatello, Larsen was questioned by the sheriffs with regard to the crime. Larsen told them that he would rather wait and speak to his attorney before making any statements. Nevertheless, pursuant to further intermittent questioning, Larsen, during the trip, did respond to about five questions, and these questions and Larsen's answers thereto were admitted into evidence at the trial. Objections to introduction of this testimony were overruled and the officers were permitted to testify as to the substance of these conversations. Error is assigned to this ruling.

At the outset it is to be noted that Larsen's responses to the sheriffs' questions were entirely voluntary and in no way attributable to coercion or the physical conditions attending the trip. At the trial, Larsen, on cross-examination, repeatedly stated this to be the fact. Some of his testimony in this regard is set forth in the footnote.[1]

Appellant contends, however, that because the statements were elicited from him

---

1. "Q And we don't have any element of coercion or that you made the answer that you say you made because you were uncomfortable and handcuffed or anything like that, do we?

"A No, sir. We don't.

\* \* \* \* \*

"Q \* \* \* Now your answer was not —your answer to their question as you have related it was not due to any discomfort or anything of that nature at this time, was it?

"A I don't believe any of my answers were due to discomfort especially \* \* \*.

\* \* \* \* \*

"Q All right. At this point now we don't have involved here that your answer to this question was prompted by the fact that you were manacled and may have been cold outside or anything of that nature, do we, or cold inside?

"A No, sir. \* \* \*

\* \* \* \* \*

"Q And this doesn't have anything to do, does it, with whether or not you had had a cup of coffee, hadn't had a cup of coffee, whether you had been to the restroom or hadn't been to the restroom, does it?

"A I can't say directly that it did; no, sir.

\* \* \* \* \*

"Q Now again your reply to that question was not based on any fact that you were handcuffed or that you—the method in which you were being transported to Pocatello, was it?

"A No, sir. Not due to the method I was being transported; no, sir.

"Q In other words, actually that didn't have any bearing at all in your reply to these questions, did it?

"A No, sir. The transportation itself didn't.

\* \* \* \* \*

"Q And there isn't any element of duress or anything of that involved in the matter at all, is there?

"A No. I don't believe so."

before he had an opportunity to consult with his attorney, they were thereby rendered inadmissible in that he was denied his right to counsel as guaranteed by the Sixth Amendment to the United States Constitution, Escobedo v. State of Illinois, 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964), and made obligatory upon the states by the Fourteenth Amendment, Gideon v. Wainwright, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed. 2d 799 (1963).

In *Escobedo* the Supreme Court stated: "We hold, therefore, that where, as here, the investigation is no longer a general inquiry into an unsolved crime but has begun to focus on a particular suspect, the suspect has been taken into police custody, the police carry out a process of interrogations that lends itself to eliciting incriminating statements, *the suspect has requested and been denied an opportunity to consult with his lawyer, and the police have not effectively warned him of his absolute constitutional right to remain silent,* the accused has been denied 'the Assistance of Counsel' in violation of the Sixth Amendment to the Constitution as 'made obligatory upon the States by the Fourteenth Amendment,' Gideon v. Wainwright, 372 U.S. [335], at 342, [83 S.Ct. 792 at 795, 9 L.Ed.2d 799] and that no statement elicited by the police during the interrogation may be used against him at a criminal trial." (Emphasis added) 378 U.S. at 490–491, 84 S.Ct. at 1765.

The Court added, however, that:

"The accused may, of course, intelligently and knowingly waive his privilege against self-incrimination and his right to counsel either at a pretrial stage or at the trial. * * *" 378 U.S. at 490, n. 14, 84 S.Ct. at 1765.

The Supreme Court did not hold that all statements taken in the absence of counsel are rendered inadmissible. As was recognized by the Supreme Court in Crooker v. State of California, 357 U.S. 433, 78 S.Ct. 1287, 2 L.Ed.2d 1448 (1958), the facts and circumstances of each case must be considered before determining whether one's constitutional right to counsel has been violated. Although the authority of part of *Crooker* [2] has been weakened somewhat by subsequent decisions of the court,[3] it has not been overruled or abandoned, for in *Escobedo* the Court distinguished *Crooker* on its facts.

The facts of the present case compel us to conclude that Larsen was not denied his constitutional right to counsel. Neither was he denied his constitutional right against self-incrimination because the record reveals that he answered the questions of the officers with knowledge of his constitutional right to remain silent. When Larsen was questioned by the police in 1962, shortly after the body of the deceased was discovered, he retained his present counsel, who apparently advised him of his rights at that time or at some time afterward for at the trial Larsen stated unequivocally that at the time of his arrest he was aware of his right to remain silent and to refuse to answer questions propounded by the authorities. Larsen's testimony on cross-examination is as follows:

"Q There was no misunderstanding in any event on your part as to why they came to get you, was there?

"A No, sir. I was informed of that from the time I was arrested.

"Q Well, you were well aware that the reason that Sheriff Parker and Sheriff Aikens were there, is that correct?

"A Yes, sir.

"Q Now I believe you stated that at this time they asked you to make a statement, but you told them you didn't wish to, is that correct?

"A Yes, sir.

---

**2.** In that case, as in *Escobedo,* but unlike the present factual situation, the accused, while being interrogated at the police station, repeatedly requested the assistance of counsel, which was denied.

**3.** 378 U.S. at 492, n. 15, 84 S.Ct. 1758.

"Q *So you were well aware then, I take it, that if you didn't wish to make any statement to them you didn't have to?*

"A Yes, sir." (Emphasis added.)

In addition, there was uncontroverted testimony that during the trip from Las Vegas to Pocatello, Larsen was advised by the sheriffs of his right to remain silent.[4]

■ We believe that the Supreme Court in *Escobedo* did not intend to insulate suspects from reasonable police questioning *after* such suspects have been apprised of their constitutional rights and afforded an opportunity to exercise those rights. Under these circumstances Larsen's knowledge of his constitutional right to remain silent to interrogation dilutes any claim by him that his right against self-incrimination was infringed. We have reviewed the decisions of the federal courts and other state courts since *Escobedo* and they are almost unanimous in their holdings that, barring exceptional circumstances, confessions, admissions or incriminating statements made by a suspect after being informed of his right to remain silent are admissible.[5]

And, we might have a very different case if Larsen, like Escobedo, while being questioned at *police headquarters,* repeatedly requested to speak to his attorney but *was denied* this request, even if he was aware of his right to remain silent. See Queen v. United States, 118 U.S.App.D.C. 262, 335 F.2d 297 (1964). In such a situa-

tion, as the Supreme Court said in *Escobedo:*

"Petitioner had become the accused, and the purpose of the interrogation was to 'get him' to confess his guilt despite his constitutional right not to do so." 378 U.S. at 485, 84 S.Ct. at 1762.

In the case before us, Larsen was not denied his request to speak with his attorney for he was afforded the opportunity to do so at the earliest possible moment—upon his arrest in Las Vegas and again upon his return to Pocatello. During the intervening period Larsen was being transported to Pocatello and it was manifestly impossible for him to contact his attorney. During the trip he made no request for permission to telephone his attorney and he knew of his right to remain silent. The routine questioning by the sheriffs during the course of the trip was incidental to their primary purpose—to return Larsen to Pocatello. There was no averment that they attempted to trick him, Massiah v. United States, 377 U.S. 201, 84 S.Ct. 1199, 12 L.Ed. 2d 246 (1964), or to "get him" to confess his guilt because of his inability to consult with his attorney during the trip.

We, therefore, conclude that Larsen was not denied his constitutional right to the assistance of counsel and the trial court did not err in permitting his statements to be admitted into evidence.

■ Error is also assigned to the trial court's refusal to permit appellant to pre-

---

4. Sheriff Aikens on direct examination stated:
"A Yes. I asked Dee [Larsen], I said, 'Dee, why don't you tell us the whole story?' To which he didn't answer at that time, and I repeated it several times. At this time Dee stated, he says, 'I would like to tell you the whole story, but I would like to talk to my attorney first.' And at this time he was assured that if he wanted to talk to his attorney that that was his right, and that if he did not want to make a statement he did not have to." Sheriff Parker on voir dire examination by appellant's counsel stated:
"* * * and I believe that was the time he asked him if he wouldn't like to

tell us the whole story, and Dee replied that he would, but he would like to talk to his attorney first. And he was assured at that time that he was perfectly within his rights if that's what he wished and that he didn't have to make any statement unless he wished to.

5. See, e. g., Jackson v. United States, 119 U.S.App.D.C. 100, 337 F.2d 136 (1964); Commonwealth of Pennsylvania v. Maroney, 348 F.2d 22 (3rd Cir. 1965); Loftis v. Eyman, 350 F.2d 920 (9th Cir. 1965); Boulden v. State, 278 Ala. 437, 179 So.2d 20 (Ala.1965).

sent evidence to the jury that one Brett Butler was the perpetrator of the crime and not Larsen. It is permissible for an accused to show that another might have committed the crime for which the accused is on trial. However:

"It is well established that before such testimony can be received, there must be such proof of connection with the crime, such a train of facts or circumstances, as tend clearly to point out someone besides the accused as the guilty party. Remote acts, disconnected and outside of the crime itself, cannot be separately proved for such a purpose." State v. Caviness, 40 Idaho 500, 507–508, 235 P. 890, 892 (1925).

A defendant in a criminal trial is not:

"* * * permitted by way of defense to indulge in conjectural inferences that some other person might have committed the offense for which he is on trial, or by fanciful analogy to say to the jury that some one other than he is more probably guilty." State v. Moon, 20 Idaho 202, 209, 117 P. 757, 758 (1911).

Appellant made an offer of proof to the court, in the absence of the jury, attempting to prove that Butler was the killer of the deceased.

For the purpose of this opinion we shall separate appellant's offer into two parts. The first part, viewing the offer most favorably to appellant even though some of the items would have been inadmissible in any event, includes the following alleged facts:

Butler was a suspect in the case shortly after the discovery of the deceased. The investigation by the police revealed that blood stains were found on the back seat of Butler's car and on a spare tire in the trunk. Butler claimed the stains were "hamburger blood," but the results of tests revealed they were human blood, Type A or A–B. There is a suggestion that this blood might have been the deceased's; however, no *offer* was made to show that the deceased's blood matched either of these types. The investigation further revealed that the trunk of Butler's automobile was thoroughly washed and cleaned but the interior and exterior were very dirty. Sagebrush, cedar buck brush and wild grass were found on Butler's car, similar to that growing in the vicinity of the gravesite. There also was an offer that various people who resided near the gravesite observed a car in the vicinity on April 14, 1962, the day of the murder, and that this car remained in the area for several days thereafter. A large pile of beer bottles and other items "apparently cleaned from an automobile" was observed after the car left the area. There was no offer, however, to show that this automobile was Butler's, nor was a description of the car offered. There also was an offer to show that Butler was off duty from his job from the afternoon of April 14, 1962, until the following Monday morning and that when he returned to work he had deep scratches on his face which were explained by Butler as the result of an automobile accident. In addition, there was an offer to show that Butler was observed having sexual intercourse with the deceased and that they lived together in an apartment for several days. Also, there was an offer to show that the deceased told a school mate that she was pregnant with a child of a married man or thought she was pregnant but that the man would not marry her. Although the deceased told her friend the name of the married man, the witness could not remember it at the trial. There was no offer to show that Butler was married at that time. The deceased also informed this same witness approximately three weeks prior to her disappearance that she knew she was going to die and that someone was going to kill her. No offer was made as to whether the deceased revealed the name of this person.

The foregoing fairly represents the substance of appellant's offers of proof. The offers do not approach the test established in State v. Caviness and State v. Moon, supra. They are not "such a train of facts or circumstances, as tend clearly to point out

some one besides the prisoner as the guilty party"; they are nothing more than "conjectural inferences" that one other than Larsen committed the crime and, therefore, are inadmissible.

■ The second part of appellant's offer of proof consisted of an alleged oral confession made by Butler shortly after the deceased's body was discovered. Appellant offered to prove by three disinterested witnesses that Butler, in their presence, admitted killing the deceased and that he related certain other details concerning the crime.[6] The apparent majority of jurisdictions in this country exclude confessions of third parties, made out of court, which tend to exonerate the accused, because such confessions are hearsay admissions against a *penal* interest rather than a pecuniary or proprietary interest and, therefore, are inadmissible. See Donnelly v. United States, 228 U.S. 243, 33 S.Ct. 449, 57 L.Ed. 820 (1913), and cases cited therein; Annot. 48 A.L.R. 348 supplementing 35 A.L.R. 441; 20 Am.Jur. Evidence § 495; 22A C.J.S. Criminal Law § 749.

This rule, however, has been criticized as lacking reason and rationale. See, e. g., Holmes, J., dissenting in Donnelly v. United States, supra; Traynor, J., in People v. Spriggs, 60 Cal.2d 868, 36 Cal.Rptr. 841, 389 P.2d 377 (1964); Sutter v. Easterly, 354 Mo. 282, 189 S.W.2d 284, 162 A.L.R. 437 (1945); 5 Wigmore, Evidence §§ 1476–1477 (3d ed.); McCormick, Evidence § 255, p. 549; 1 Wharton, Criminal Evidence § 438 (11th ed.); Uniform Rules of Evidence 63(10); ALI Model Code of Evidence, Rule 509. And, while the rule is generally regarded as representing the majority view, numerous exceptions have been fashioned by various courts. Thus, third-party confessions have been held admissible where the only evidence of the defendant's guilt was his repudiated confession, People v. Lettrich, 413 Ill. 172, 108 N.E.2d 488 (1952); where the prosecution's case was based entirely on circumstantial evidence, Blocker v. State, 55 Tex.Cr. 30, 114 S.W. 814 (1908);[7] where the third party's confession, if believed, might reduce the degree of punishment of the accused, even though it would not exonerate him, Brady v. State, 226 Md. 422, 174 A.2d 167 (1961), aff'd 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); where the third party's confession was written and he was available as a witness, Thomas v. State, 186 Md. 446, 47 A.2d 43, 167 A.L.R. 390 (1946, this opinion also criticizes the general rule); and, where there is substantial direct evidence to corroborate the confession and indicate the guilt of the third party, Brennan v. State, 151 Md. 265, 134 A. 148, 48 A.L.R. 342 (1926); Hines v. Commonwealth, 136 Va. 728, 117 S.E. 843, 35 A.L.R. 431 (1923); Newbury v. Commonwealth, 191 Va. 445, 61 S.E.2d 318 (1950); Stanley v. State, 48 Tex.Cr. 537, 89 S.W. 643 (1905, dictum); State v. Fletcher, 24 Or. 295, 33 P. 575 (1893, dictum). There is also authority which makes a complete break with the general rule and would admit a bare confession. People v. Spriggs, 60 Cal.2d 868, 36 Cal. Rptr. 841, 389 P.2d 377 (1964); Mason v.

6. In addition to stating, "Well, I killed her. * * * Well, you wait and see. When this all comes out you'll find out I was the one," Butler allegedly also told these same witnesses that he picked up the deceased at Fort Hall on Saturday night, April 14, and killed her; that he buried her with one shoe on and one shoe off; that the grave was too small and he had to dig out the head and foot of the grave; that he burned the shoes he was wearing the night of the murder because the police had obtained some footprints near the gravesite; that the deceased was dead several hours before he buried her; that he gave accurate directions to the gravesite; that he knew the deceased before her death; and that he burned the tires which were on his automobile.

7. This exception in Texas apparently has been modified to require in addition to merely a circumstantial case against the defendant, that the accused's guilt be inconsistent with the guilt of the third party and a showing of facts that the third party was so situated that he might have committed the crime. Cameron v. State, 153 Tex.Cr. 29, 217 S.W.2d 23 (1949).

United States, 257 F.2d 359 (dictum), cert. den. 358 U.S. 831, 79 S.Ct. 52, 3 L.Ed.2d 69 (1958); In re Winineger's Petition, 337 P.2d 445 (Okl.Cr.1959, dissenting opinion).

The exceptions to the hearsay rule which permit certain types of hearsay to be admitted into evidence are based on the proposition that the evidence is likely to be truthful and may be highly probative. So it is that admissions against a pecuniary or proprietary interest made by a third party who is "unavailable" as a witness are admissible because it is unlikely that the declarant would make statements which are adverse to his own interest. 5 Wigmore, Evidence §§ 1457–1475 (3d ed.). We believe the same rationale applies to admissions against a penal interest. It is at least as probable that admissions which may subject oneself to criminal liability are as trustworthy as those which may subject oneself to financial liability.

We are not prepared to hold, however, that a bare, out-of-court confession is nevertheless admissible. To do so might have a serious injurious effect on the administration of criminal law for it would open the door to defendants to produce perjured and fraudulent "confessions" by others who, for some unexplained reason, have "disappeared" or are otherwise "unavailable" as witnesses.

"It is not difficult to see the abuses to which the general admission of such testimony might lead. Every one accused of crime would be tempted to introduce perjured testimony concerning statements of some third person, then beyond the jurisdiction of the court, admitting that such third person and not the defendant, had committed the crime in question, and the experience of courts renders it certain that many would yield to such a temptation." Brennan v. State, 151 Md. 265, 134 A. 148, 150, 48 A.L.R. 342 (1926).

"If evidence of this kind was admissible as original testimony for a defendant, it would be impossible to convict any thief, because he could always find witnesses who would testify that they had heard some one who was absent confess to being guilty of the crime. To hold that such evidence was competent would put a premium on fraud, make perjury safe, and place the state at the mercy of criminals. This would make a mockery of the law, and will not be permitted in the courts of Oklahoma." Davis v. State, 8 Okl.Cr. 515, 128 P. 1097, 1099 (1913).

Although there is no indication of a furtive plan between Butler or the witnesses to his confession and Larsen, we do not think this circumstance alone mitigates against the holding herein. As was stated above, to admit bare confessions would be an open invitation to perjury of a kind that would be most difficult to ascertain.

██ We, therefore, hold that third-party confessions, made out of court, are admissible only when there is other substantial evidence which tends to show clearly that the declarant is in fact the person guilty of the crime for which the accused is on trial. Applying this rule to the facts of the case before us, it is apparent that Larsen failed to satisfy the test and the trial court's ruling that Butler's confession was inadmissible was correct.

██ Appellant also assigns error to the trial court's denial of his motion for a mistrial because of the alleged improper conduct of the prosecuting attorney. The basis of this objection is that while questioning Richard Burt on direct examination, the prosecuting attorney repeatedly asked Burt if Larsen had, prior to the murder of the deceased, made any statements to Burt about wanting to "kill someone." Burt answered in the affirmative but was not permitted to testify as to the substance of this conversation because he could not specify at exactly what time or place these conversations allegedly occurred. However, on redirect examination Burt was permitted to state, without objection, that Larsen "said before he settled down and got married he wanted to kill somebody" and that Larsen "was always talking about it." Furthermore, there was another witness who testified that shortly before the crime

Larsen stated, "I have a perfect murder planned." Under these circumstances no prejudice resulted from the prior references by the prosecuting attorney to Larsen's statements as to his desire to "kill someone."

■ Appellant contends that subsequent to his arrest and conviction he was entitled to be released on bail. However, Art. I, § 6, of the Idaho Constitution [8] explicitly excludes the right to bail in capital offenses. See also I.C. § 19–2903.

■ Appellant also contends that he was unlawfully convicted on the basis of the uncorroborated testimony of an accomplice, Burt. I.C. § 19–2117.[9] However, there was sufficient other evidence to connect Larsen with the crime. Larsen admitted being the last known person to see the deceased alive and admitted being in the vicinity where she was seen last and admitted being with Burt at the time Burt claimed they both found the body, although Larsen denied finding the body. There is sufficient evidence to corroborate Burt's testimony and to connect Larsen with the crime. State v. Bassett, 86 Idaho 277, 385 P.2d 246 (1963).

Appellant makes numerous other assignments of error, none of which are either discussed by argument in the brief or supported by authority therein. Because this is a capital case, we have reviewed the record carefully and find these assignments to be without substance or merit and the trial court's ruling thereon did not prejudice any of Larsen's rights or create reversible error.

Judgment affirmed.

McFADDEN, C. J., and TAYLOR, SMITH and SPEAR, JJ., concur.

8. "Right to bail—Cruel and unusual punishments prohibited.—All persons shall be bailable by sufficient sureties, except for capital offenses, where the proof is evident or the presumption great. Excessive bail shall not be required, nor excess fines imposed, nor cruel and unusual punishments inflicted."

9. "19–2117. Testimony of accomplice—Corroboration.—A conviction can not be had on the testimony of an accomplice, unless he is corroborated by other evidence, which in itself, and without the aid of the testimony of the accomplice, tends to connect the defendant with the commission of the offense; and the corroboration is not sufficient, it if [sic] merely shows the commission of the offense, or the circumstances thereof."