684 S.E.2d 177

The **STATE**, Respondent,

v.

**Billy Wayne COPE, Appellant.**

No. 4526.

Court of Appeals of South Carolina.

Decided April 2, 2009.

Heard Sept. 16, 2009.

Withdrawn, Substituted and Refiled Sept. 29, 2009.

278

David I. Bruck, of Lexington, VA, James M. Morton and Michael B. Smith, both of Rock Hill, and Steven A. Drizin and Allison Flaum, both of Chicago, IL, for Appellant.

Attorney General Henry D. McMaster, Chief Deputy Attorney General John W. McIntosh, Assistant Deputy Attorney General Donald J. Zelenka, Office of the Attorney General, of Columbia; and Solicitor Kevin Scott Brackett, of York, for Respondent.

THOMAS, J.

A jury convicted Cope of murder, two counts of first degree criminal sexual conduct, criminal conspiracy, and unlawful conduct towards a child. He was sentenced to life imprisonment, plus thirty years.[1] Cope appeals. We affirm.

---

1. Cope was sentenced as follows: life imprisonment for murder (2002–GS–46–3232) and thirty years for criminal sexual conduct first degree (2002–GS–46–3234), consecutive to the life sentence. He was also sentenced to thirty years for criminal sexual conduct first degree (2002–GS–46–3233); five years for conspiracy (2004–GS–46–200); and ten

## FACTS/PROCEDURAL HISTORY

Between approximately 2:00 and 4:00 a.m. on Thursday, November 29, 2001, 12-year-old Child was murdered in her bedroom. Billy Cope, her father, testified he awoke at 6:00 a.m. and called out to wake her. When she did not respond, he went to her room, where he found her body lying on her bed. Cope called 911. He told police he did not hear any sounds that night because he sleeps with a sleep apnea machine that makes a loud noise. Police checked the exterior and interior of the house for any signs of forced entry, including all the doors and windows, but everything appeared to be secured. One of Cope's two younger daughters (Sister) testified she and Child locked both doors before they went to bed that evening.

Cope was standing outside when Jason Dillon, an emergency medical technician (EMT), arrived at the house. Cope advised Dillon and another EMT that Child had been dead "four hours." Dillon did not ask Cope if he meant "for" or "four." Cope told Dillon that Child choked herself with her blanket. He also told him he found Child naked and he dressed her. The forensic pathologist, Dr. James Maynard, arrived and found Child lying on her back on her bed, with her shirt pulled up and her left breast exposed. He testified it appeared she had not dressed herself because her bra was unattached and her pants were pulled up unevenly.

Dr. Maynard performed Child's autopsy and determined she had been beaten, strangled, severely sexually assaulted, and sodomized, most likely with a blunt foreign object such as a broom handle or a dildo. Dr. Maynard testified he believed Child had been repeatedly sexually abused and sodomized over a period of time, not just the night of the murder. He testified it did not appear Child was strangled by her blanket. He further testified some of Child's injuries were consistent with a 300-pound man jumping on her.[2] During the autopsy, Dr. Maynard discovered a bite mark on Child's right breast and took a swab of the area. Upon testing, it was discovered

years for unlawful conduct toward a child (2004–GS–46–2614), all concurrent with the other two convictions.

**2.** At the time of Cope's arrest, he weighed 333 pounds.

the saliva matched co-defendant James Sanders' DNA. Dr. Maynard testified the bruise on Child's breast was a similar age as the rest of her injuries, which all seemed to be inflicted at approximately the same time. The police also discovered semen on Child's pants, which matched Sanders' DNA. No other semen was found on or near Child's body.

Cope was first interviewed at the police station at about 8:00 a.m. on November 29, 2001. Cope consented to giving samples for a DNA test. Later that same day, about 12:00 p.m., police again interviewed Cope. His story changed slightly in the second interview as to the time his daughters went to bed and whether he had to kick in Child's bedroom door to enter her room that morning. Cope was allowed to leave the station after the second interview. At 10:50 p.m., police picked Cope up from his mother's house to take him back to the police station for a third interview. After the third interview, the officers decided to arrest Cope.

Charlene Blackwelder, detective for Rock Hill Police Department, took the arrest warrant to Judge Margy McNeely between 3:00 and 4:00 a.m. on November 30, 2001. Judge McNeely issued the warrant based on the fact that Cope was the only adult home at the time of the murder and the lack of evidence of forced entry. Cope was placed in a cell at about 2:30 a.m. and he was charged with murder at 4:31 a.m.

Later, on the morning of November 30th, Cope was served with three warrants for unlawful neglect toward a minor child.[3] Blackwelder testified she served Cope with these warrants prior to his transportation to the Moss Justice Center at about 10:00 a.m. for his polygraph examination. Michael Baker, polygraph examiner at York County Sheriff's Office, read Cope his *Miranda*[4] warnings and Cope voluntarily waived his constitutional rights. After the exam, Baker informed Cope he had failed the polygraph exam. Lieutenant Herring and Baker continued questioning him. Cope gave his first confession at 2:25 p.m. Cope stated he awoke at 3:00 a.m. to use the bathroom, went into Child's room, and masturbated

---

3. The trial court severed the charges of unlawful neglect for the two younger children.

4. *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

while she was sleeping. Child woke up and said, "gross, daddy," which angered Cope, so he jumped on top of her and began swinging his fists at her head. He slammed her head onto a video game on her bed and strangled her with both hands. He also used the blanket to choke her. Cope then used a broom handle both anally and vaginally on Child. Before going back to bed, he deleted temporary internet files from his computer and threw away his dildo.

At a bond hearing on December 1, 2001, Cope was approved for representation by a public defender. Later, on December 2, 2001, he told the police he wanted to talk to them again. On December 3, 2001, officers spoke with Cope again and Cope told them his prior statements were incorrect. In his second confession at 9:45 a.m., Cope said he was asleep and had a dream about an old girlfriend that had aborted his child. He got so angry that he jumped on her, beat her, and raped her with the broom. He did not realize it was Child until he fell backwards and was jarred to his senses. He then tried to throw away everything in the house that made him look guilty and he pulled up her pants. He went back to bed and when he woke up, he hoped it was a dream. After his second confession, Cope agreed to go back to his house with the police to reenact the crime on videotape. Cope gave his third confession at 4:55 p.m. when they returned to the police department. In the third confession, Cope confessed he had been going into Child's room since the end of October and "playing with her" by fingering her while she was asleep. That night, when he went into her room, she was asleep on her stomach and he inserted his dildo inside her, waking her. He then attacked and strangled her. He cleaned up, closed her bedroom door, and went to bed.

During Cope's third confession, Cope's appointed counsel arrived. Captain Cabaniss of the Rock Hill Police Department testified he informed Cope an attorney was there to meet with him, but Cope replied he did not want to see the attorney. Cope signed a statement to that effect.

Cope presented an expert who testified he scored Cope's polygraph examination and Cope passed the examination. Cope presented another expert, Dr. Clay Nichols, who testified Child's injuries were not specifically consistent with a

300–pound man jumping on her and there was no indication a broom was used on Child in the assault. Nichols also testified he did not see any signs of chronic sexual abuse. Additionally, Cope presented a locksmith to testify the doors could be opened with either a credit card or driver's license or by picking the lock without showing signs of forced entry.

The jury convicted Cope and this appeal follows.

## LAW/ANALYSIS

## I. EVIDENTIARY ISSUES

"In criminal cases, the appellate court sits to review errors of law only." *State v. Wilson*, 345 S.C. 1, 5, 545 S.E.2d 827, 829 (2001). "The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of discretion." *State v. Clasby*, 385 S.C. 148, 682 S.E.2d 892 (2009) (Shearouse Adv. Sh. No. 37, at 29, 34) (citing *State v. Brazell*, 325 S.C. 65, 78, 480 S.E.2d 64, 72 (1997)).

### A. Admissibility of Similar Crimes

Cope argues the trial court erred in refusing to admit evidence of similar crimes in the Rock Hill area allegedly perpetrated by Sanders, contending this evidence was probative in identifying Sanders as the sole perpetrator and in showing a common scheme pervaded both the other crimes and the matter at issue in this appeal. Cope argues he should at least have been able to introduce evidence of the other crimes without referring to Sanders as the perpetrator. Cope cites numerous jurisdictions and legal articles indicating when a defendant is attempting to introduce "other crimes" evidence, the court should apply a lower standard of similarity. We disagree.

The admissibility of "other crimes" evidence is governed in South Carolina by Rule 404(b) of the South Carolina Rules of Evidence, which provides: "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident,

or intent." Rule 404(b), SCRE; *see State v. Lyle,* 125 S.C. 406, 416, 118 S.E. 803, 807 (1923) (finding such evidence admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent).

██ To be admissible against a defendant in a criminal proceeding as evidence of identity, "the bad act must logically relate to the crime with which the defendant has been charged." *State .v. Pagan,* 369 S.C. 201, 211, 631 S.E.2d 262, 267 (2006). In contrast, to admit evidence about other bad acts against an accused to show the existence of a common scheme or plan, "[a] close degree of similarity establishes the required connection between the two acts and no further 'connection' must be shown for admissibility." *State v. Wallace,* 384 S.C. 428, 683 S.E.2d 275 (S.C. 2009) (Shearouse Adv. Sh. No. 37, at 18, 22–23).

Some jurisdictions lower the standard of similarity necessary for admission of evidence of "other crimes" when, as here, a defendant is attempting to introduce the evidence. *See State v. Garfole,* 76 N.J. 445, 388 A.2d 587, 591 (1978) (stating "a lower standard of degree of similarity of offenses may justly be required of a defendant using other-crimes evidence defensively than is exacted from the State"); *see also United States v. Stevens,* 935 F.2d 1380, 1403 (3d Cir.1991) (applying a lower standard and quoting *Garfole); United States v. Cohen,* 888 F.2d 770, 776 (11th Cir.1989) (finding standard for admission relaxed when the evidence is offered by a defendant). This is sometimes called the "Reverse 404(b) Rule." Jessica Broderick, Comment and Casenote, *Reverse 404(b) Evidence: Exploring Standards When Defendants Want to Introduce Other Bad Acts of Third Parties,* 79 U.Colo.L.Rev. 587, 587 (2008). Even with a lower standard of similarity, the defendant must still show the other crimes are of a similar nature. *See Rivera v. State,* 561 So.2d 536, 539–40 (Fla.1990) (recognizing lower standard of admissibility but finding other crimes dissimilar enough to determine trial court did not abuse discretion in excluding evidence).

The State charged Sanders with numerous crimes occurring shortly after Child's death. Cope proffered the testimony of four of Sanders' victims. Victim 1 testified that on December 12, 2001, at about 11:30 p.m., Sanders knocked at her apart-

ment door and asked to use her telephone. He pushed her door open, knocked her down, got on top of her, and kissed her. Sanders then raped her, demanded money, and destroyed her telephone.

Victim 2 testified that on December 16, 2001, Sanders came to her house at about 1:00 a.m. She had fallen asleep on her couch and when she woke, Sanders was standing over her. She did not hear anyone come in the house and her dog did not bark. When she screamed, Sanders put his hand over her mouth and pinned her under a rocking chair. Sanders ran onto her second-floor patio and jumped off when her dog began barking and her daughter called for her.

Victim 3 testified that on December 19, 2001, at about 7:30 p.m., she had just come home when Sanders came through her front door and attacked her. When she tried to crawl to her room, Sanders placed a plastic bag over her head. When she removed the bag, Sanders put a rug over her head and as she was trying to remove the rug, Sanders got on top of her and tried to remove her pants. She grabbed an ink pen from her pocket and stabbed Sanders in the leg. Sanders shoved Victim 3 into one of the bedrooms, closed the door, and left. At some point, he asked her for money.

Victim 4 testified that on January 12, 2002, at about midnight, she was in her room watching a movie when she heard a knock at her door. When Victim 4 opened the door, Sanders pushed the door in and shoved her into the bathroom. The fight continued in the kitchen where Sanders kicked and pushed Victim 4. Sanders also held Victim 4 in a choke hold and tried to get on top of her several times. While Victim 4 was on the floor, Sanders ran into her room and grabbed her purse. As he was trying to leave, Victim 4 grabbed a pan from the stove and hit Sanders with it. He dropped the purse and Victim 4 grabbed her Mace. She tried to spray him, but missed. She then saw a small screwdriver on the floor and swung it at him, hitting him at least once in the shoulder.

Mindful of our standard of review, we find no reversible error in the trial court's exclusion of this evidence. Although there are some similarities between the other crimes and Child's assault, there are also many differences. For instance, no other crime resulted in the death of the victim or involved a

child. None of the proffered crimes included the brutality of the attack on Child such as anal penetration and assault with a foreign object. We therefore hold Cope has not shown a close degree of similarity between the other bad acts and the charged offenses, much less any logical relation between the assault on and murder of Child and the other incidents in the vicinity allegedly involving Sanders and other victims. Based on these holdings, we affirm the trial court's ruling that Sanders' other crimes are dissimilar to these facts and are therefore inadmissible under *Lyle* and Rule 404(b), even if reviewed under a lower standard because proffered by a defendant, to show either identity or the existence of a common scheme.

### B. Testimony of James Hill

Cope argues the trial court erred in excluding testimony from James Hill. We disagree.

Evidence is relevant if it tends to make the existence of any fact of consequence to the determination of the action more or less probable than it would be without the evidence. Rule 401, SCRE. All relevant evidence is admissible. *State v. Douglas*, 369 S.C. 424, 429–30, 632 S.E.2d 845, 848 (2006). Relevant evidence may be excluded if the prejudicial effect of its admission substantially outweighs the probative value of the evidence. Rule 403, SCRE. The trial court has broad discretion in determining the relevancy of evidence and its decision to admit or exclude evidence will not be reversed on appeal absent an abuse of that discretion and a showing of prejudice. *State v. Gaster*, 349 S.C. 545, 557, 564 S.E.2d 87, 93 (2002).

Cope proffered the testimony of James Hill, who is serving a sentence for burglary. Hill testified he was in his cell in a segregation unit in prison near the end of 2002. Hill recognized Sanders' distinctive voice and overheard Sanders and another inmate laughing about how easy it was to get away with crimes. Sanders allegedly stated he was "going to get away with what he did to that little girl in Rock Hill." Sanders allegedly "went on to explicitly describe what he had done." Sanders remarked about oral and anal sodomy and smothering the child. Finally, Sanders "alluded to the fact that he had got in through a window in the house and that he had left

through the same window." Sanders objected to the evidence as irrelevant. The court excluded the evidence as irrelevant because there were no identifying characteristics, noting the testimony did not specify time, place, or other circumstances.

We again look to our standard of review and determine the trial court did not abuse its discretion in excluding Hill's testimony. *See State v. Alexander*, 303 S.C. 377, 380, 401 S.E.2d 146, 148 (1991) (reiterating the standard of review of a trial judge's ruling on questions concerning the relevancy of evidence and looking for guidance to other jurisdictions that have addressed the particular issue concerning relevancy); *State v. Larsen*, 91 Idaho 42, 415 P.2d 685, 692 (1966) (noting the potential of abuse from ruling "that a bare, out-of-court confession is ... admissible" and holding "that third-party confessions, made out of court, are admissible only when there is other substantial evidence which tends to show clearly that the declarant is in fact the person guilty of the crime for which the accused is on trial"); *People v. Cruz*, 162 Ill.2d 314, 205 Ill.Dec. 345, 643 N.E.2d 636, 650 (1994) (reciting the rule that "[a]n extrajudicial declaration not under oath, by the declarant, that he, and not the defendant on trial, committed the crime is inadmissible as hearsay, though the declaration is against the declarant's penal interest," but allowing an exception "where there are sufficient indicia of trustworthiness of such extrajudicial statements").

### C. Admission of "False Confessions" Expert Testimony

■ Cope argues the trial court erred in excluding testimony of his false confession expert about two cases of coerced internalized false confessions. We disagree.

■ The admissibility of an expert's testimony is a matter within the trial court's sound discretion. *State v. Douglas*, 367 S.C. 498, 507, 626 S.E.2d 59, 63 (Ct.App.2006). The trial court's decision to admit expert testimony will not be reversed on appeal absent an abuse of discretion. *Id.* at 507, 626 S.E.2d at 64. "An abuse of discretion occurs when the ruling is based on an error of law or a factual conclusion that is without evidentiary support." *Id.* To warrant reversal, any error by the trial court in admitting or excluding expert testimony must result in prejudice. *Id.* at 508, 626 S.E.2d at 64.

Rule 702 of the South Carolina Rules of Evidence governs the admissibility of testimony by experts, providing:

If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

Rule 702, SCRE.

The precise issue of prohibiting an expert from relating case studies to the jury was raised in *State v. Myers*, 359 S.C. 40, 596 S.E.2d 488 (2004). In *Myers*, the expert[5] was qualified as an expert in social psychology and testified about the psychology of confessions and false or coerced confessions. *Id.* at 50, 596 S.E.2d at 493. The trial court in *Myers* prohibited the expert from testifying about the facts of particular cases from Connecticut and Indiana in which people falsely confessed to crimes and were later exonerated. *Id.* In affirming the trial court, our supreme court found the expert related some facts about the specific cases but did not use names. *Id.* at 51, 596 S.E.2d at 494. Furthermore, the court found no prejudice in part because the expert "was able to testify at length about false and coerced confessions." *Id.* Therefore, the court found any error in excluding specific case studies from the expert's testimony was harmless as the evidence was merely cumulative to the expert's other testimony. *Id.*

This issue was also addressed in *State v. Pittman*, 373 S.C. 527, 647 S.E.2d 144 (2007). In *Pittman*, the trial court allowed the defendant to present "a copious amount" of evidence regarding the antidepressant drugs Selective Serotonin Reuptake Inhibitors (SSRIs). 373 S.C. at 578, 647 S.E.2d at 170–71. The defendant was permitted to introduce evidence that SSRIs could cause mania and other conditions, and to present anecdotal testimony regarding the antidepressant Paxil by a user of Paxil. *Id.* The trial court excluded anecdotal evidence regarding the antidepressant Zoloft.[6] *Id.*

In affirming the trial court, our supreme court stated:

---

5. Dr. Kassin, the expert in this case, was also the expert in *Myers*.

6. Pittman changed antidepressants from Paxil to Zoloft shortly before committing a double homicide. *Id.* at 543, 647 S.E.2d at 152.

[T]he court was concerned about the reliability of the anecdotal reports compared with the reliability of reports from clinical studies done in a controlled environment. The court was also concerned with the trustworthiness of the sources of the anecdotal testimony, as well as the ability of experts to establish the causal link between the Zoloft and the incidents. Despite these concerns, the trial court permitted the above expert testimony regarding Zoloft obtained from reliable methods, consistent with the South Carolina Rules of Evidence.

The record shows a conscientious decision on the part of the trial court to not admit evidence with questionable reliability where there was an abundance of other admissible evidence found to be reliable. Additionally, the trial court correctly found that the prejudicial effects outweighed the probative value of the anecdotal evidence.

*Id.*

In this case, Cope presented an expert, Dr. Saul Kassin, who testified regarding false confessions. Dr. Kassin testified as to the interrogation techniques used by the police in obtaining false confessions and the techniques used in this case: (1) false evidence—the officers telling Cope he failed the polygraph; (2) positive confrontation—the officers claiming they knew Cope did it; (3) the officers' refusals to accept Cope's denials of guilt even though he agreed to a polygraph and waived an attorney; (4) minimization—the officers suggesting the crime was accidental; and (5) interrogation while Cope was traumatized and tired.

Dr. Kassin proffered testimony about Peter Reilly, who falsely confessed to murdering and sexually assaulting his mother, and Gary Gauger, who falsely confessed to murdering his parents. In both of these cases, the defendants denied involvement, were administered polygraphs and told they failed, believed they must have somehow committed the crimes, and confessed. The trial court refused to allow Dr. Kassin to testify regarding specific cases of false confession unless they were "on all fours" with this case and ultimately refused to allow the testimony. The trial court in this case conscientiously considered the proffered anecdotal evidence before excluding this testimony. The theories underlying the

study of coerced internalized false confessions were exhaustively presented to the jury. Dr. Kassin explained the techniques used by interrogators that can lead to false confessions and informed the jury that there were "innumerable actual cases" of coerced internalized false confessions. Therefore, we find the exclusion of the testimony regarding the specific details of the Reilly and Gauger cases does not constitute reversible error.

## D. Admissibility of Cope's Statements

■ Cope argues the trial court erred in denying his motion to suppress his statements because he was arrested without probable cause. We disagree.

■ "The fundamental question in determining the lawfulness of an arrest is whether probable cause existed to make the arrest." *State v. Baccus,* 367 S.C. 41, 49, 625 S.E.2d 216, 220 (2006). "Probable cause for a warrantless arrest exists when the circumstances within the arresting officer's knowledge are sufficient to lead a reasonable person to believe that a crime has been committed by the person being arrested." *Id.* A magistrate's determination of probable cause should be paid great deference by the reviewing court. *State v. Sullivan,* 267 S.C. 610, 617, 230 S.E.2d 621, 624 (1976) (reviewing magistrate's finding of probable cause to issue search warrant).

■ Whether probable cause exists depends upon the totality of the circumstances. *State v. George,* 323 S.C. 496, 509, 476 S.E.2d 903, 911 (1996) (finding probable cause for warrantless arrest). In assessing probable cause, the court looks to whether the facts and circumstances are sufficient for a reasonable person to believe that a crime has been committed by the person to be arrested. *Id.*

Judge McNeely testified she issued the warrant based on the fact that Cope was the only adult home at the time of the murder and there was a lack of evidence of forced entry. Based on the totality of the circumstances, we agree with the trial court there was probable cause to arrest Cope.[7]

---

7. We also note Cope was served with the warrants for unlawful neglect toward a minor child the morning of November 30th, prior to any of his confessions.

■ Cope next argues the statements he made after the bond hearing on December 1st should have been suppressed because he applied for and was found eligible for representation by a public defender.[8]

■ In *State v. Council,* our supreme court stated:

The Sixth Amendment right to counsel attaches when adversarial judicial proceedings have been initiated and at all critical stages. The Sixth Amendment right attaches only "post-indictment," at least in the questioning/statement setting. When the Sixth Amendment right to counsel has attached, if police initiate interrogation after a defendant's assertion, at an arraignment or other similar proceedings, of his right to counsel, any waiver of the defendant's right to counsel for that police initiated interrogation is invalid **unless the defendant initiates the contact himself.**

335 S.C. 1, 15–16, 515 S.E.2d 508, 515 (1999) (internal citations omitted) (emphasis added). Furthermore, a waiver is knowingly and intelligently made where a defendant waives his right to counsel after having been apprised of his *Miranda* rights. *State v. Howard,* 296 S.C. 481, 494, 374 S.E.2d 284, 291 (1988) (citing *Patterson v. Illinois,* 487 U.S. 285, 296–97, 108 S.Ct. 2389, 101 L.Ed.2d 261 (1988)).

Cope argues the bond hearing triggered his right to counsel. We need not determine if the bond hearing triggered Cope's right to counsel because we find Cope waived his right to counsel prior to making his second and third statements.[9] Cope was charged with murder in the early morning hours of November 30th. At approximately 9:00 a.m., Cope was served with the child neglect warrants and then taken to the polygraph examination where he was read his *Miranda* warnings. Between 9:30 and 10:00 a.m., Cope was transported to the Moss Justice Center for his polygraph examination. Baker read Cope his *Miranda* warnings and Cope voluntarily waived his constitutional rights. The polygraph examination began at 11:15 a.m. After the examination, Baker informed Cope he had

8. Only Cope's first confession, made November 30th, was made prior to the bond hearing.

9. *See Rothgery v. Gillespie County, Tex.,* —— U.S. ——, 128 S.Ct. 2578, 171 L.Ed.2d 366 (2008) (comprehensively discussing the attachment of the Sixth Amendment right to counsel).

failed. Lieutenant Herring and Baker continued questioning Cope. Cope gave his first confession at 2:25 p.m.

On Sunday, December 2, Cope told the Rock Hill police he wanted to talk to the investigating officers again. Officer Herring told the Rock Hill dispatcher to inform Cope they would speak to him the following day. On December 3, Cope made his second and third confessions and the video reenactment.

We find Cope knowingly and intelligently waived his right to counsel by initiating the contact with the investigating officers prior to his second and third confessions and after receiving *Miranda* warnings. Accordingly, we find no error by the trial court in denying Cope's motion to suppress his confessions.

## II. SEVERANCE

■ Cope argues the trial court erred in denying his motion for severance. Cope complains the evidence of Sanders' other crimes could be admitted as evidence of third-party guilt in a separate trial. We disagree.

■ A motion for a severance and separate trial is addressed to the sound discretion of the trial judge and the ruling will not be disturbed on appeal absent a showing of an abuse of discretion. *State v. Nichols,* 325 S.C. 111, 122, 481 S.E.2d 118, 124 (1997). A defendant who alleges he was improperly tried jointly must show prejudice before the appellate court will reverse his conviction. *State v. Dennis,* 337 S.C. 275, 281–83, 523 S.E.2d 173, 176 (1999).

■ Criminal defendants who are jointly tried for murder are not entitled to separate trials as a matter of right. *Id.; State v. Kelsey,* 331 S.C. 50, 73, 502 S.E.2d 63, 75 (1998). This is true even when a defendant's severance motion is based upon the likelihood he and a codefendant will present mutually antagonistic defenses such as accusing each other of committing the crime. *State v. Leonard,* 287 S.C. 462, 473, 339 S.E.2d 159, 165 (Ct.App.1986), *reversed on other grounds,* 292 S.C. 133, 355 S.E.2d 270 (1987).

■ Admissibility of evidence under the third-party guilt doctrine is governed by the rule in *State v. Gregory,* 198 S.C. 98, 16 S.E.2d 532 (1941). The rule states:

[E]vidence offered by accused as to the commission of the crime by another person must be limited to such facts as are inconsistent with his own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence; evidence which can have (no) other effect than to cast a bare suspicion upon another, or to raise a conjectural inference as to the commission of the crime by another, is not admissible ... [B]efore such testimony can be received, there must be such proof of connection with it, such a train of facts or circumstances, as tends clearly to point out such other person as the guilty party.

*Gregory,* 198 S.C. at 104–05, 16 S.E.2d at 534–35 (internal citations omitted). Evidence of third-party guilt may include: (1) facts that are inconsistent with the defendant's guilt; and (2) evidence raising a reasonable inference as to the accused's innocence. *State v. Rice,* 375 S.C. at 317, 652 S.E.2d at 416. *See also Holmes v. South Carolina,* 547 U.S. 319, 331, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006) (holding that to prohibit, on the strength of the prosecution's case, evidence of third-party guilt proffered by an accused violated the right of the accused to present a complete defense).

Cope sought to introduce evidence of Sanders' other crimes in a separate trial to prove Sanders' guilt and his ability to enter victims' homes without signs of forced entry. The jury in this case was aware Sanders was involved in Child's murder due to the presence of his DNA. The jury was made aware of evidence that the Cope house could have been entered without signs of forced entry as Cope presented testimony from a locksmith that the lock could have been picked or a credit card could have opened the door lock without leaving signs of forced entry. The evidence of Cope's involvement, such as his confessions and the evidence of the lack of forced entry, would still have been admitted in a separate trial. We find the introduction of the evidence of Sanders' other crimes would not have been inconsistent with Cope's guilt, even if offered in a separate trial, and would not have raised an inference as to Cope's innocence. Accordingly, we find no error by the trial court in denying Cope's motion for severance.

## III. CONSPIRACY

Cope argues the trial court erred in failing to direct a verdict on the conspiracy charge based on the lack of evidence

supporting an agreement between Sanders and Cope. We disagree.

■■■■ "In reviewing the denial of a motion for a directed verdict, the evidence must be viewed in the light most favorable to the State, and if there is any direct evidence or any substantial circumstantial evidence reasonably tending to prove the guilt of the accused, an appellate court must find that the case was properly submitted to the jury." *Kelsey*, 331 S.C. at 62, 502 S.E.2d at 69 (1998). "In ruling on a motion for a directed verdict, the trial court is concerned with the existence of evidence, not its weight." *Id.* In addressing the standard of review where the State relies exclusively on circumstantial evidence and a motion for directed verdict is made, our supreme court has stated:

> [T]he circuit court is concerned with the existence or nonexistence of evidence, not with its weight. The circuit court should not refuse to grant the directed verdict motion when the evidence merely raises a suspicion that the accused is guilty. *"Suspicion" implies a belief or opinion as to guilt based upon facts or circumstances which do not amount to proof.* However, **a trial judge is not required to find that the evidence infers guilt to the exclusion of any other reasonable hypothesis.**

*State v. Cherry*, 361 S.C. 588, 594, 606 S.E.2d 475, 478 (2004) (emphasis in original) (internal citations omitted).

■■■■ Criminal conspiracy is defined as "a combination between two or more persons for the purpose of accomplishing an unlawful object or a lawful object by unlawful means." S.C.Code Ann. § 16–17–410 (2003). "The essence of a conspiracy is the agreement." *State v. Buckmon*, 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001). "Often proof of conspiracy is necessarily by circumstantial evidence alone." *State v. Miller*, 223 S.C. 128, 133, 74 S.E.2d 582, 585 (1953). Nevertheless, "the law calls for an objective, rather than subjective, test in determining the existence of a conspiracy." *State v. Crocker*, 366 S.C. 394, 406, 621 S.E.2d 890, 897 (Ct.App.2005). Moreover, in viewing the sufficiency of the evidence to support a charge of conspiracy, an appellate court "must exercise caution to ensure the proof is not obtained 'by piling inference upon inference.'" *State v. Gunn*, 313 S.C. 124, 134, 437 S.E.2d

75, 81 (1993) (quoting *Direct Sales Co. v. U.S.,* 319 U.S. 703, 711, 63 S.Ct. 1265, 87 L.Ed. 1674(1943)).

"The gravamen of the offense of conspiracy is the agreement or combination." *Gunn,* 313 S.C. at 134, 437 S.E.2d at 80; *see also State v. Condrey,* 349 S.C. 184, 193, 562 S.E.2d 320, 324 (Ct.App.2002) (stating the crime of conspiracy "consists of the agreement or mutual understanding"). Recognition of this reality, however, does not compromise the standard that a trial court must use in deciding a directed verdict motion when the evidence against an accused is entirely circumstantial, namely, that the case must be submitted to the jury only "if there is substantial circumstantial evidence which reasonably tends to prove the guilt of the accused or from which his guilt may be fairly and logically deduced." *State v. Arnold,* 361 S.C. 386, 390, 605 S.E.2d 529, 531 (2004).

We recognize that in the present case there was no direct evidence of an agreement between Cope and Sanders. The State's evidence of a conspiracy was entirely circumstantial, including: (1) forensic evidence that the bite mark where Sanders' DNA was found was inflicted within the same two-hour time frame as the injuries that Cope confessed to inflicting; (2) Sister's testimony that she and Child locked the doors before they went to bed and testimony that there was no evidence of forced entry; (3) the deduction from the forensic evidence that Sanders was present in a secure private home after the residents had retired for the night; (4) testimony that the house was full of debris and passage inside, particularly at night, would have been difficult for someone not familiar with the residence; (5) statements by Cope revealing knowledge about the factors of the assault and injuries to Child consistent with forensic evidence; (6) evidence that Cope delayed calling the police after he claimed to have fatally strangled and choked Child; and (7) evidence that Cope staged the scene to make Child's death appear to have been an accident.

Nevertheless, in the present case, the DNA evidence on Child's body, along with Cope's admissions about his interactions with Child shortly before she died, place Cope and Sanders together at the time of the assault on Child and her resulting death. Likewise, the testimony regarding lack of forced entry and the cluttered condition of the home constitute

evidence that Sanders, who had no known connection with Cope's family, received assistance to navigate his way to Child's bedroom. Finally, Cope's staging of the crime scene after Child died is evidence that a cover-up had begun before Cope called the police to his home on the pretext that Child had accidentally strangled herself, notwithstanding compelling forensic evidence that Sanders was present and actively participating during the same time period in which her death was determined to have occurred. Although each of these factors alone may have supported only a mere suspicion of a conspiracy between Cope and Sanders, it is our view that when considered together, they yield the requisite level of proof of "acts, declarations, or specific conduct" by the alleged conspirators to withstand a directed verdict motion on this charge. *See State v. Hernandez*, 382 S.C. 620, 625, 677 S.E.2d 603, 605 (2009) (reversing a conviction for trafficking and noting "the State failed to present any evidence such as acts, declarations, or specific conduct to support [an] inference" that the petitioners had knowledge that drugs were being transported).

## CONCLUSION

We affirm the trial court's evidentiary rulings and the denial of Cope's motion for severance. We further hold the trial court properly declined to direct a verdict of acquittal for Cope on the issue of criminal conspiracy. Cope's convictions are therefore

**AFFIRMED.**

SHORT and PIEPER, JJ., concur.