748 S.E.2d 194

The STATE, Respondent,

v.

Billy Wayne COPE, Petitioner.

Appellate Case No. 2009–143966.

No. 27303.

Supreme Court of South Carolina.

Heard Nov. 13, 2012.

Decided Aug. 28, 2013.

James M. Morton and Michael B. Smith, both of Morton & Gettys, LLC, of Rock Hill; David I. Bruck, of Washington & Lee School of Law, of Lexington, VA; Steven A. Drizin, of Northwestern University School of Law, of Chicago, IL; and Chief Appellate Defender Robert M. Dudek, of Columbia, for Petitioner.

Attorney General Alan M. Wilson, Chief Deputy Attorney General John W. McIntosh, Senior Assistant Deputy Attorney General Donald J. Zelenka, all of Columbia, Solicitor Kevin S. Brackett, of York, for Respondent.

Justice HEARN.

This case presents us with the brutal sexual assault and murder of twelve-year-old Child. Based on those events, Child's father, Billy Wayne Cope, was convicted of murder, two counts of first degree criminal sexual conduct (CSC),

criminal conspiracy, and unlawful conduct towards a child.[1] The court of appeals affirmed Cope's convictions in *State v. Cope*, 385 S.C. 274, 684 S.E.2d 177 (Ct.App.2009). We granted certiorari to review the court of appeals' opinion and now affirm.

## FACTUAL/PROCEDURAL BACKGROUND

The facts surrounding the sexual assault and murder of Child are graphic and profoundly disturbing. Shortly after 6:00 a.m. on the morning of November 29, 2001, Cope called 911 and reported finding Child dead in her bed, apparently from being choked by a piece of her blanket which was wrapped around her neck. When asked if she was breathing or if he had attempted CPR, Cope twice replied that she was "cold as a cucumber."

The response team arrived and Cope informed them his daughter was dead. When the medical technician asked how long she had been that way, he responded "four hours."[2] Cope also informed him that Child had a history of rolling in her sleep and she choked herself on her blanket.

Police examined the windows and doors and found no signs of forced entry. The house itself was in "extreme disarray," with clothes and boxes everywhere and roaches and cat feces throughout the house. Additionally, several responders noted that Cope acted strangely and was on his computer when they arrived while his two other daughters were huddled on the couch.

Cope was interviewed several times that day. In his first interview, Cope told police that Child's Youngest Sister went to bed around 9:30 p.m., but he allowed Child and her Middle Sister to stay up later so Child could help Middle Sister with math homework, and they went to bed around 12:30 a.m. Cope said he woke up around 6:00 a.m. and called Child's name

---

1. Cope's co-defendant, James Sanders, was also convicted of murder, first degree criminal sexual conduct, and criminal conspiracy and was sentenced to life imprisonment plus thirty years. His convictions were affirmed on appeal. *State v. Sanders*, 388 S.C. 292, 696 S.E.2d 592 (Ct.App.2009). He is not a party to this appeal.

2. Cope contends he said, and meant, "for hours," not "four hours."

several times, but she did not answer. He went to her room and found her lying on her back with a strip of her blanket wrapped around her neck. Youngest Sister and Middle Sister, who slept in a separate bedroom, came to the doorway, and he told them to go to the living room; then he called 911. Cope stated no one except the family had been in the home that day and he did not hear any noises that night because he sleeps with a CPAP machine for his sleep apnea as well as several fans. He agreed to accompany the police to the hospital so a rape kit could be performed and mentioned that his skin might be under Child's fingernails because she had scratched his back the night before.

When he was again interviewed around noon that day, he told police Child went to bed at 1:00 a.m. Cope also stated that when Child failed to answer him that morning, he initially thought "the rapture" had occurred and she had been taken to heaven. He said he had to kick Child's bedroom door open because it was jammed against her closet door. Cope again informed the police he thought her death was an accident because he did not hear any noise in the night.

Dr. James Maynard, the State's forensic pathologist who performed an autopsy on Child, placed her time of death between 2:00 a.m. and 4:00 a.m. He noted her clothing appeared as if it had been placed upon her by another person, with her bra unhooked and her pants not pulled up all the way. He noted she had injuries to her head consistent with being struck repeatedly, and she had been manually strangled. He further noted that the absence of ligature marks indicated she had not been strangled by the blanket. Although Dr. Maynard found Child on her back, he stated it appeared she was turned several times after her death. He noted she had injuries consistent with a 300–plus–pound man kneeling on top of her.[3]

Dr. Maynard further found Child had been brutally sexually assaulted, both vaginally and anally. He observed the severity of the injuries indicated they could not have been inflicted by an erect penis, but must have been from a hard object, such as a dildo or broom handle. Additionally, he noted Child

3. At the time of Child's death, Cope weighed approximately 385 pounds.

had a bite mark on one of her breasts. It also appeared she had been cleaned up after the assault.

Dr. Maynard observed that her hymen was absent, as were any remnants to indicate it had been torn during this incident. He stated she had vaginal irritation consistent with past penetration. He further noted evidence of past anal penetration.

The police brought Cope back in for another interview that evening following receipt of the autopsy results. Cope was apprised of some of the facts, including that Child had been sexually assaulted. This interview lasted over four hours and was recorded. This time, Cope stated he had gotten up at 3:00 a.m. to use the bathroom and did not check on Child because her door was closed, but checked on his other two daughters. Cope repeatedly denied any involvement in Child's death and requested that a polygraph test be performed. After the interview, he was arrested and charged with murder as well as three counts of unlawful neglect for the deplorable condition of his home. Police arranged for him to take a polygraph test the following morning.

He met with the polygraph examiner, Michael Baker, around 10:00 a.m. the next morning. During the exam, Baker asked: "did you choke [Child]"; "did you choke [Child] causing her to die"; and "were you in the room when [Child] died"? Cope answered each question in the negative. Baker scored the exam and determined Cope had not answered truthfully. According to Baker, Cope did not act surprised when he was informed he had failed the exam. Cope asked if he could have done it in his sleep, and Baker responded that he did not think that was possible. Cope then stated he "must have done it."

Cope then proceeded to confess to Baker. He stated he woke up around 3:00 a.m. and went to use the bathroom, after which "he still had an erection," so he walked into Child's room and began masturbating. Child woke up and said, "Gross, daddy." Cope, enraged by her comment, jumped on top of her and began swinging his fists, hitting her in the head with his hands and a video game that was in the bed with her. He then began choking her with both hands and the blanket. He stated that he used a broom to penetrate her both anally

and vaginally. Although he acknowledged there was a dildo in the house, he stated he had not used it on Child. Cope then said he deleted some temporary files off his computer, threw the dildo out the back door, and went to sleep. He could not remember what he did with the broom. Cope signed a written statement memorialized by Baker, indicating at the end that "these are the images that come into my mind." Cope shook hands with Baker after the interview, and Baker noted he seemed relieved to get the information off his chest.

Two days later, on December 2, Cope, who was in the county jail, requested to speak to the detectives again. He was transported to the sheriff's department the next morning and gave the following handwritten statement:

I was asleep in my bed. I had a bad dream about an old girlfriend who had an abortion. The thought of her makes me cringe. In my dream she was telling me that I had an abortion with your child and I told her no. I became so enraged that I got out of bed. All I could hear was that laughing sound. I do not know what came over me, but I snapped and I jumped on the bed and straddled [Child]. I hit her in the head and started choking her. I did not know it was my own daughter until after I had shoved the broom stick in her privates. I fell back jarring me to my senses and I realized it was my daughter. I became so confused that I tried to rid the house of all the stuff that would make me look guilty. I grabbed the broom and I pulled it from her vagina. I pulled her panties and pants up. I did not know it was my own daughter until I fell backwards. The next morning at 6:03 when my alarm and phone rang out I was hoping it was a very bad dream.

Cope was asked if he would be willing to return to his home, walk the police through, and explain what happened. Police stated he was very willing to do so and he only had to be asked once. The visit to Cope's residence was videotaped. The video depicted the same version of the facts Cope had written in his second confession to the police and included not just Cope's description of the events, but also his reenactment. Cope also indicated in the video he had wrapped the blanket around her neck to make it seem like an accident. He was asked if his semen would be found anywhere on the scene, and he said it would not.

Later that afternoon, Cope was again interrogated and was presented with some of the facts police had discovered from Child's autopsy report, including the presence of semen. Cope admitted to having masturbated into a cloth and informed the police where they could find it. The interrogation resulted in Cope signing the following statement, memorialized by one of the detectives:

I woke up about three a.m. I went to the bathroom and I went into [Child's] room. I had a hard on. I jacked off in the floor and used a blue towel to clean it up. I started going into [Child's] room about the end of October through the first part of November playing with her and rubbing her and fingering her while she was asleep. [Child] was asleep on her stomach. I think the dildo inside her is what woke her up. When she woke up I jumped on top of her to keep her from turning and looking at me, then I heard her say, "Daddy, help me." I started strangling her with my hands. [Child] was pulling at my hands and I let go and started hitting her in the head and I went back to strangling her and she went limp. I got up, I saw the green string on the blanket and I was thinking to myself this would look like she strangled herself. I took the green strip and I wrapped it around her neck. I went straight with the wrap from off the floor and I wrapped it around her throat. I pulled both ends tight. I pulled both ends so it would be good and tight. Her hands were already at her neck so I left them. I jumped up off the bed and went and put the dildo up. I wiped it off first with the blue towel and then put it under the bed in the floor in the bedroom. Normally I put it between the mattress at the head of the bed but it had fallen so I put it at the head of the bed on the floor where it was. Then I fixed the doors of [Child's] bedroom so that they would lock. I pulled the closet and the door together, that's how I locked it. I did this so the kids would not wake up and see her before morning. I got back into my bed, I put my mask on, and went to sleep. And I woke up at 6:02 according to the clock in my bedroom. I sat up and called [Child] twice since now I knew that she was not going to answer. It was like a dream. I thought it was a dream. I did not hear from [Child] those two times I called her, sir or yes, sir. I thought, I thought the rapture had just taken

place because I had just finished reading the *Left Behind* series about one month ago. I had hoped the rapture had taken place. I was praying it had. I got up and looked in on [Youngest Sister] and [Middle Sister] and they were still asleep. I went to [Child's] door and I forgot I had set the doors so I pushed on the doors and they would not open. I kicked the door open and saw [Child] laying there purple. I walked over to her and I tried to wake her and she was cold. I screamed and unwrapped the cord that I put on her neck. [Youngest Sister] and [Middle Sister] walked into the room and [Youngest Sister] started screaming. [Middle Sister] said Daddy is she dead and I said yes go get on the couch and pray as hard as you can and remember one thing she is with Jesus. I ran to the telephone which is exactly in front of the computer and I called 911. I said my daughter is dead and she is cold as a cucumber. Reality had not set in. .... Not until today 12/03/01 have I realized what I have done. Up until talking with you and the other [officer] I blocked stuff out. I am telling the truth this time. Everything I said before now is not true. When I put my fingers inside [Child] I pulled her panties, pants and panties down and used my two fingers. I could have jammed my hand down inside her. I remember I had watered down jelly on my fingers. Around the first of October was when I first started messing with [Child] at night while she was asleep and I would go into her bedroom and finger her and use a dildo on her. I did this many times.

The investigation against Cope proceeded; however, by the end of December, the police were aware that the DNA evidence obtained from Child's body was not Cope's. At some point, the State determined the semen on Child's pants and the saliva from the bite mark on her breast belonged to James Sanders. Sanders was eventually also indicted in connection with Child's rape and murder on January 22, 2004, and the State then charged both Cope and Sanders with conspiracy.

The case proceeded to a joint trial, the State's theory of the case being that Cope "served up his daughter for his and [ ] Sanders' own perverse pleasures and took her life. They did it together. There is no other reasonable explanation."

In addition to presenting the confessions and autopsy report, the State called Cope's other children to testify. Youngest Sister testified she heard someone scream and gasp for air in the middle of the night, but she thought it was a dream and went back to sleep. Middle Sister testified she and Child worked on her math homework until around 1:00 a.m., when they went to bed. She claimed that, before going to bed, she and Child went around the house, turned off all the lights, and locked the front door, including the chain latch.

The State also called Amy Simmons to testify. Simmons was a friend of the family who began exchanging letters with Cope while he was incarcerated. During the course of these exchanges, Simmons testified she received a letter in May of 2004 in which Cope wrote:

God told me to tell you that I killed [Child]. I have secretly questioned God and I caught myself praising the Lord over the ending. I got my feelings hurt when I talked to my attorneys the story was not going to end on a happy note. [Child] is in the Lord [sic] Streets. Standing over her I saw her scream. My girl was returned to the spot where she belong [sic] and my enemies follow me scoffing. I don't know which way that I should turn. I didn't realize what I did until after Pastor Powell told me that she was dead. I just want to know if God was trying to share with me before it happened. Please forgive me. God is going to remove it soon. I wish that he had creeped [sic] into my head and killed me instead.

How is [sic] Brian and Jaime? I don't know whether they remember me or not. I hope you don't mind the drawing on the envelopes. I hope that you are not mad or angry. I just thought you should know. Please don't stop writing. I have to get on with my life I need to tell you that a certain police woman as always came out victorious. May God bless you with comfort today.

The State also called a handwriting expert to testify as to the authenticity of the letters.

In his defense, Cope presented expert testimony that the letters were forgeries as well as evidence that the paper the letters had been written on were not available to inmates at the prison. Simmons was also impeached with evidence she

had criminal forgery charges pending against her and that she had consented to discipline by a nursing board for forging documents. Cope additionally called Dr. Charles Honts to testify as an expert in psychology, particularly in the polygraph. Dr. Honts stated he disagreed with Baker's scoring of Cope's polygraph and opined his scoring of the examination indicated Cope had been truthful.

Cope also presented expert testimony from Dr. Saul Kassin regarding false confessions. Dr. Kassin discussed different indicia of innocence, such as waiving the right to a lawyer, consenting to a physical exam, and volunteering to take a polygraph. He noted that false confessions appear remarkably like real confessions, often including details and motive. Dr. Kassin testified that Cope had likely lost all hope after having been interrogated for hours and repeatedly professing his innocence; once he learned he failed the polygraph test, it would have shaken him. Dr. Kassin stated that when presented with false evidence indicating their guilt, people sometimes begin to doubt themselves and construct new memories based on a belief in their own guilt. He mentioned there were cases where alleged murder victims turned up alive, cases where another perpetrator was found who knew all the details of the crime, and cases where DNA evidence was discovered exonerating people who had confessed to committing those crimes.

Additionally, Cope called forensic pathologist Clay Nichols to testify. Dr. Nichols opined the sexual injuries sustained by Child could have been inflicted with an erect penis and that a 400–pound man thrusting a broom into Child's body would have resulted in much more catastrophic injuries. Dr. Nichols further noted that it was unlikely the dildo found on the scene had been used because it was less than six inches long and Child's injuries indicated she had been penetrated by an object between six to eight inches. In discussing Child's strangulation, he noted that although it was unlikely the blanket had been used, he thought only one hand had been used and that she was attacked from the front. He further opined that he found no evidence to indicate chronic sexual abuse. Dr. Nichols also stated he did not think her injuries were consistent with a 400–pound man jumping on her back.

Cope also presented the expert testimony of a locksmith that the front door could have been opened with a credit card without leaving any marks. The locksmith explained this was because the locking mechanism was a spring latch and not a dead latch.

Finally, Cope testified in his own defense. He stated that on the evening of Child's death, Youngest Sister had gone to bed at 9:30 p.m. and he had let Child and Middle Sister stay up until 1:00 a.m. working on Middle Sister's long division homework. He said he awoke around 3:00 a.m. to go to the bathroom and then tried to play a game on the computer. When he woke the next morning and Child did not answer when he called to her, he thought the rapture had taken her.

He stated that when he found her, she was not unclothed, just uncovered. He further testified they never put on the chain lock because his wife would sometimes come home from work while everyone was asleep and she would not be able to get in the house. He also testified there was a flashlight found in Child's room that he had never seen before.

Cope testified that during his police interview, the detectives continually insinuated he knew more about the crime. He eventually began to insist on taking a polygraph because he had taken two or three previously for work and he trusted them. He then testified that once he was told he had failed the polygraph, he began to doubt himself. He stated he asked if he could have done it and not known about it because he had no memory, but he had been informed that the pathologist concluded the rape was not done by a human penis, so he started putting images in his head. He then described the images that came to him.

Cope further testified that once he was in jail, he realized he had falsely confessed and the police would never believe him, so he tried to invent a second story hoping they would just think he was crazy. He then concocted the confession where he purported to kill Child while dreaming about his ex-girlfriend. During his subsequent interview, the detectives continued to point out the inconsistencies in his statements and threatened him with the death penalty if he did not finally tell them the truth. Cope testified that by then, he did not care what happened anymore; he would have said anything

and he willingly signed any statements he was given. Cope also discussed the incriminating letters to Amy Simmons and denied having ever written them.

The jury convicted Cope of murder, two counts of first degree CSC, criminal conspiracy to commit CSC, and unlawful conduct towards a child. He was subsequently sentenced to life imprisonment for murder, thirty years' imprisonment for one of the CSC charges, to be served consecutively, and thirty years' imprisonment for the other count of CSC, ten years for unlawful neglect, and five years for conspiracy, to be served concurrently.

## ISSUES PRESENTED

I. Did the court of appeals err in upholding the trial court's refusal to admit evidence of Sanders' other crimes and failure to sever the trials?

II. Did the court of appeals err in affirming the trial court's exclusion of testimony offered to show Sanders had bragged to fellow inmates about how he was going to get away with the murder and rape of "a little girl in Rock Hill"?

III. Did the court of appeals err in affirming the trial court's refusal to allow Cope's false-confessions expert to specifically discuss factually similar cases?

IV. Did the court of appeals err in affirming the trial court's denial of Cope's motion for a directed verdict on the charge of criminal conspiracy?

## LAW/ANALYSIS

## I. EVIDENCE OF OTHER CRIMES

Cope argues the court of appeals erred in affirming the trial court's refusal to allow admission of evidence of Sanders' other crimes. We disagree.

In criminal cases, the appellate court sits solely to review errors of law. *State v. Baccus*, 367 S.C. 41, 48, 625 S.E.2d 216, 220 (2006). "The trial judge has considerable latitude in ruling on the admissibility of evidence and his decision should not be disturbed absent prejudicial abuse of

discretion." *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009). An abuse of discretion occurs when the trial court's ruling is based on an error of law. *State v. Washington*, 379 S.C. 120, 124, 665 S.E.2d 602, 604 (2008).

Cope's defense relied in part on the theory that Sanders acted alone. In support of this contention, Cope sought to establish Sanders was capable of entering the home without signs of forced entry by introducing evidence that Sanders had committed similar crimes in Cope's neighborhood around the time of Child's assault. Prior to trial, Cope proffered the testimony of four other victims, which is summarized below.

*First Incident:* The victim testified that on December 12, 2001, at approximately 11:00 p.m., Sanders knocked on her door and asked to use her phone because he had car trouble. When she went to the door, Sanders pushed the door in and attacked her. Sanders carried her to the bedroom and laid her on the bed. He kissed her on the mouth and breasts and raped her. Sanders then asked her for money and the victim gave him twenty dollars from her pocketbook. The victim was sixty years old.

*Second Incident:* The victim testified that on December 16, 2001, she had fallen asleep on the couch and woke up around 1:00 a.m. with Sanders standing over her. She screamed and Sanders put his hand over her mouth and trapped her under a rocking chair. At the time, she was living in a second story apartment with her husband and three daughters, but her husband was out. She continued screaming and her dog began to bark so one of her daughters ran in to see what was wrong and Sanders then fled, jumping off her balcony. He had apparently entered through her unlocked patio door.

*Third Incident:* The victim testified she returned to her apartment, near Cope's home, around 7:30 or 8:00 p.m. on December 19, 2001, and she immediately went to the bathroom. After exiting the bathroom, the victim noticed her front door was cracked, and she walked towards the door to close it. A man, who she later identified as Sanders in a photographic lineup, came through the door. The victim began fighting Sanders, and he tried to put a plastic bag over her head, which she was able to claw through and remove. Sanders then tried to wrap a rug around her head, and he

turned her over on her stomach, pulled up her shirt, and attempted to unbuckle her belt. The victim grabbed a pen from her back pocket and stabbed Sanders with it several times in his leg. Sanders shoved her into a bedroom and fled. The victim stated she was twenty years old when the attack occurred. She testified he did not choke her. She also identified Sanders as the perpetrator in court.

*Fourth Incident:* The victim testified she was renting a room in a house within a few blocks of Cope's home. Her bedroom connected to a bathroom that also had a door that went into the kitchen. She testified she was watching a movie in her bed around midnight on January 12, 2002, when she heard a knock at her bathroom door. The victim asked who was there, and no one answered. She heard another knock, again asked who was there, got out of bed, and walked toward the bathroom door, assuming it was one of her roommates. When she got to the door, Sanders pushed it open, hitting the victim's head with the door. The two began fighting and moved to the kitchen, where Sanders pushed her to the ground and kicked and stomped on her back. Sanders put her in a choke hold and pulled her off the ground. She tried to punch Sanders, and he let her go briefly and threw her to the ground, kicking her again. While the victim was on the ground, Sanders went back into the bedroom and grabbed her purse. She then grabbed a baking pan and hit Sanders in the head with it. The contents of her purse spilled out and the victim grabbed her Mace; however, Sanders pushed her back down to the ground, and she sprayed most of the Mace on herself. The victim then grabbed a screwdriver off the floor and began stabbing at Sanders, piercing his left shoulder and causing him to flee. She further testified there were no signs of forced entry, and neither she nor the police were able to determine how Sanders gained access to her house. The victim was nineteen when the attack occurred. She had identified Sanders from a photograph and also identified him in court.

Although the trial court found Cope had presented clear and convincing evidence that Sanders committed these other crimes, it declined to allow in the testimony, holding the other crimes were not sufficiently similar to be admitted under Rule 404(b), SCRE. The court of appeals affirmed, noting that

although other jurisdictions have adopted a lesser standard of similarity in evaluating this type of reverse 404(b) evidence—where evidence of other crimes has been offered in exculpation by the defendant—here the crimes were too dissimilar to pass even a lesser threshold.

### A. Rule 404(b) Analysis

■ Cope argues the trial court erred in refusing to admit evidence of Sanders' other crimes under Rule 404(b). We disagree.

■ "Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Rule 404(b), SCRE; *see State v. Lyle*, 125 S.C. 406, 415–16, 118 S.E. 803, 807 (1923) (noting the rule "universally recognized and firmly established in all English-speaking countries, that evidence of other distinct crimes committed by the accused may not be adduced merely to raise an inference or to corroborate the prosecution's theory of the defendant's guilt of the particular crime charged"). "However, such evidence may be admissible to show motive, identity, the existence of a common scheme or plan, the absence of mistake or accident, or intent." Rule 404(b). As a threshold matter, the trial court must determine whether the proffered evidence is relevant as required under Rule 401, SCRE. *Clasby*, 385 S.C. at 154, 682 S.E.2d at 895. If the trial court finds the evidence is relevant, it must then determine whether the bad act evidence fits within an exception in Rule 404(b). *Id.*

■ Where there is a close degree of similarity between the crime charged and the prior bad act, the prior bad act is admissible to demonstrate a common scheme or plan. *Id.* at 155, 682 S.E.2d at 896. "When determining whether evidence is admissible as common scheme or plan, the trial court must analyze the similarities and dissimilarities between the crime charged and the bad act evidence to determine whether there is a close degree of similarity." *Id.* The evidence is admissible if the similarities outweigh the dissimilarities. *Id.* "If the defendant was not convicted of the prior crime, evidence of the prior bad act must be clear and convincing." *State v. Gaines*, 380 S.C. 23, 29, 667 S.E.2d 728, 731 (2008). Even if prior bad

act evidence is clear and convincing and falls within an exception, it must be excluded if its probative value is substantially outweighed by the danger of unfair prejudice to the defendant. *Clasby*, 385 S.C. at 155, 682 S.E.2d at 896.

We find no abuse of discretion in the exclusion of this evidence. Although there are some similarities between the crime charged and the other acts, there are also many distinctions. Those crimes all occurred subsequent to Child's murder and none of them involved children. Only one of those victims was raped and that rape did not include anal penetration, the use of a foreign object, nor was the victim cleaned up afterward. Additionally, none of the attacks involved manual strangulation or resulted in the victim's death. Furthermore, although those crimes arguably demonstrate that Sanders could enter a house without signs of forced entry, his method varied wildly, ranging from a ruse to entering through an unlocked door. Given these differences, we cannot conclude the trial judge abused his discretion in finding the evidence was inadmissible under a Rule 404(b)/ *Lyle* analysis.[4]

■■■■■■ Alternatively, Cope argues the trial court should have analyzed the evidence under a more permissive standard because the testimony was not being offered by the State. He cites to several jurisdictions that have adopted a less stringent standard for admission of "other crimes" evidence when it is offered by a defendant in exculpation. While his assertion has some appeal, Cope failed to present this argument before the trial judge, and the issue is thus unpreserved. "It is axiomatic that an issue cannot be raised for the first time on appeal." *Herron v. Century BMW*, 395 S.C. 461, 465, 719 S.E.2d 640,

---

4. The dissent criticizes our analysis of the similarities as ineffectual given the evidence that Sanders committed the other crimes as well as the charged crimes. We disagree that identity alone precludes consideration of the other particulars of the crimes. If the purpose of the evidence is to show that Sanders acted pursuant to a common scheme, we fail to see how we can decline to look at the commonality of the entire crimes when determining admissibility. We cannot look only to the fact that Sanders committed all the subsequent assaults alone simply because that is the detail Cope wants the jury to draw inferences from. The jury would be presented with all the specifics of these crimes and we therefore cannot ignore the differences that militate against a conclusion Sanders employed *any* common scheme.

642 (2012). Prohibiting an appellant from raising an issue for the first time on appeal ensures that the trial court is able "to rule properly after it has considered all relevant facts, law, and arguments." *Id.* We therefore find it would be inappropriate to find error on an issue never properly raised below.

## B. Due Process

■■■ Relying on the United States Supreme Court's decision in *Holmes v. South Carolina,* 547 U.S. 319, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006), Cope also argues that by excluding this evidence, he was denied his constitutional right to present a defense.[5] There, Holmes sought to introduce evidence that another man, White, had actually perpetrated the crimes for which he was charged. *Id.* at 323, 126 S.Ct. at 1730–31. He proffered several witnesses who testified White had been in the neighborhood where the crime occurred on the morning it was committed. *Id.* He also presented testimony of witnesses who claimed White had admitted committing the crimes. *Id.* The trial court refused to admit the evidence, noting the substantial incriminating evidence presented by the State and concluding that Holmes "could not overcome the forensic evidence against him to raise a reasonable inference of his own innocence." *Id.* at 324, 126 S.Ct. at 1731 (internal quotations omitted). On appeal, this Court affirmed the trial court in *State v. Holmes,* 361 S.C. 333, 605 S.E.2d 19 (2004), and the United States Supreme Court reversed. Specifically, the Supreme Court held the trial court violated Holmes' right to a "meaningful opportunity to present a complete defense" by excluding evidence of third-party guilt on the grounds that the State had introduced forensic evidence that, if believed, strongly supports a guilty verdict. *Holmes v. South Carolina,* 547 U.S. at 330–31, 126 S.Ct. at 1734–35 (internal quotation omitted).

The facts here are distinguishable from *Holmes.* It was not the strength of the State's case that led to exclusion of evidence of Sanders' other crimes. Instead, it was because the other crimes were not sufficiently similar to the crime charged so as to be admissible. *Holmes* plainly acknowledges

---

5. *Holmes* was issued after Cope's trial, but three years prior to the court of appeals' opinion.

that excluding evidence because its probative value is outweighed by unfair prejudice, confusion of the issues, or potential to mislead the jury is not violative of the Constitution. *Id.* at 326, 126 S.Ct. at 1732. Because we find the exclusion of this testimony was appropriate for those exact reasons, we hold Cope's federal due process rights were not violated. We accordingly affirm the court of appeals' affirmance of the trial court's exclusion of this testimony.

## C. Severance

Cope then argues the evidence of other crimes would have been admissible as evidence of third-party guilt in a separate trial and the court of appeals erred in upholding the denial of his motion for a severance. We disagree.

In South Carolina, criminal defendants who are jointly tried for murder are not entitled to separate trials as a matter of right. *State v. Kelsey,* 331 S.C. 50, 73, 502 S.E.2d 63, 75 (1998). Motions for a severance are addressed to the discretion of the trial court. *Id.* at 74, 502 S.E.2d at 75. A severance should be granted only when there is a serious risk that a joint trial would compromise a specific trial right of a co-defendant or prevent the jury from making a reliable judgment about a codefendant's guilt. *State v. Dennis,* 337 S.C. 275, 282, 523 S.E.2d 173, 176 (1999) (citing *Zafiro v. United States,* 506 U.S. 534, 113 S.Ct. 933, 122 L.Ed.2d 317 (1993)). Furthermore, "[a]n appellate court should not reverse a conviction achieved at a joint trial in the absence of a reasonable probability that the defendant would have obtained a more favorable result at a separate trial." *State v. Stuckey,* 347 S.C. 484, 497, 556 S.E.2d 403, 409 (Ct.App.2001).

After the trial court refused the admission of testimony regarding Sanders' other crimes, Cope moved to sever the trials, arguing severance would prevent any prejudice against Sanders. The trial court declined, clarifying that prejudice was not the basis for its ruling and further stating the evidence would not have been admitted even if Cope was tried alone because the crimes were so dissimilar. The court of appeals, noting evidence of Sanders' guilt would not be inconsistent with Cope's guilt, affirmed the trial court. It thus concluded that evidence of Sanders' other crimes would be

inadmissible in a separate trial as evidence of third-party guilt because it did not raise an inference of Cope's innocence.

The admissibility of evidence of third-party guilt is governed by *State v. Gregory*, 198 S.C. 98, 16 S.E.2d 532 (1941). In *Gregory*, we held evidence of third-party guilt that only tends to raise a conjectural inference that the third party, rather than the defendant, committed the crime should be excluded. 198 S.C. at 105, 16 S.E.2d at 534. Furthermore, to be admissible, evidence of third-party guilt must be "limited to such facts as are inconsistent with [the defendant's] own guilt, and to such facts as raise a reasonable inference or presumption as to his own innocence." *Id.* at 104, 16 S.E.2d at 534 (internal quotations omitted). Pursuant to this standard, we find the proffered testimony in this case would only produce speculation as to whether Sanders acted alone in Child's rape and murder and would therefore have been excluded in a separate trial. Evidence of Sanders' guilt is not inconsistent with Cope's guilt, nor does it raise a "reasonable inference"—and certainly not a presumption—of Cope's innocence. We therefore affirm the court of appeals in finding that the trial court did not err in refusing to grant a severance to allow Cope to admit this evidence.

## II. TESTIMONY OF JAMES HILL

Cope contends the court of appeals erred in affirming the trial court's exclusion of testimony from an inmate, James Hill, who allegedly heard Sanders telling other inmates how he raped and killed "a little girl in Rock Hill." We find no reversible error.

During a proffer, Hill testified he was jailed with Sanders in a segregation unit in late 2002, when he overheard Sanders talking with another inmate. Sanders joked about how police were not doing their jobs, and he bragged that it was easy to "delude them." According to Hill, Sanders "made the comment that he was going to get away with what he did to that little girl in Rock Hill." Hill testified Sanders indicated he had committed oral and anal sodomy on the child, and Sanders claimed he had smothered her. Hill stated Sanders was explicit about the liberties he took with the child and Sanders claimed he entered and exited though a window before pro-

ceeding to another house. Hill testified he met Cope in another part of the jail a few months later, and he realized Sanders' statement was important when he overheard Cope talking about his case with another inmate.

In objecting to the admission of the testimony, Sanders argued that it was "not relevant to this case because there [have] been no identifying characteristics," noting that there are many criminal allegations against him, so nothing makes this relevant. The trial court sustained the objection, stating "there has been no testimony as to time, place, other circumstances." The court of appeals affirmed, concluding the trial court did not abuse its discretion in finding the testimony was irrelevant.

■■■ Cope contends the court of appeals erred in concluding Hill's testimony was irrelevant. Additionally, he argues it was admissible as an out-of-court statement by an unavailable declarant and the exclusion amounted to a violation of his constitutional rights. Although we agree the testimony passes the threshold of relevance under Rule 401, we nevertheless find it inadmissible as hearsay which would not fall within the proposed exception.[6]

■■■ Rule 804(b)(3), SCRE, provides as exception to the hearsay rule for the admissibility of out-of-court statements against penal interest made by an unavailable declarant. "However, if offered to exculpate the accused in a criminal trial, they are admissible only if corroborating evidence **clearly** indicates the trustworthiness of the statements." *State v. Kinloch*, 338 S.C. 385, 388, 526 S.E.2d 705, 706 (2000). "The rule does not require *that the information within the statement* be clearly corroborated, it means only that there be

---

6. We therefore agree with the dissent that the testimony was relevant under Rule 401. However, we disagree with the dissent's conclusion that Sanders' challenge to the admissibility of Hill's testimony went to the weight of the evidence and not to admissibility. Certainly, the factual discrepancies would go to the weight of the evidence, but prior to examining the veracity of the statement, the court must address whether the proponent has put forth sufficient evidence to demonstrate the statement was actually *made* so as to be admissible. *See Kinloch*, 338 S.C. at 389, 526 S.E.2d at 707 ("The corroboration requirement is a preliminary determination as to the statement's admissibility, not an ultimate determination about the statement's truth.").

corroborating circumstances which clearly indicate the trust-worthiness of the statement itself, i.e., that the statement was actually made." *Id.* at 389, 526 S.E.2d at 707. However, we have noted that "[i]n many instances, it is not possible to separate these two considerations in analyzing the matter of corroboration." *State v. McDonald,* 343 S.C. 319, 324, 540 S.E.2d 464, 466 (2000). "Whether a statement has been sufficiently corroborated is a question left to the discretion of the trial judge after considering the totality of the circum-stances under which a declaration against penal interest was made." *State v. Wannamaker,* 346 S.C. 495, 501, 552 S.E.2d 284, 287 (2001) (internal quotations omitted).

█ Accordingly, to fall within this hearsay exception, the statement must be clearly corroborated so as to establish that the statement was made. We find here that it was not. As the trial court noted, there was no testimony on "time, place, [or] other circumstances" to verify this statement was ever made by Sanders. Hill is unsure to whom Sanders allegedly made the statements, which frustrates any ability to confirm Sanders actually said this to anyone. Furthermore, the state-ment does not detail specifics of the crimes, and even gets some salient facts wrong. There was no evidence oral sex was performed on Child and she was not smothered. Moreover, there is absolutely no mention of Cope, a detail doubtful to be omitted whether Sanders conspired with him, or was only aware he had been arrested for Sanders' crimes. We accord-ingly find that although Hill's testimony may have been rele-vant, it was nevertheless inadmissible as hearsay because it was not clearly corroborated so as to indicate its trustworthi-ness.

## III. EXCLUSION OF SPECIFICS FOR FALSE–CON-FESSION EXPERT

█ Cope also alleges the trial court erred in refusing to allow Dr. Saul Kassin—Cope's false-confession expert—to tes-tify about specific cases involving false confessions.

██ "Generally, the admission of expert testimony is a matter within the sound discretion of the trial court." *State v. Whaley,* 305 S.C. 138, 143, 406 S.E.2d 369, 372 (1991). Thus, we will not reverse the trial court's decision to admit or

exclude expert testimony absent a prejudicial abuse of discretion. *State v. White,* 382 S.C. 265, 269, 676 S.E.2d 684, 686 (2009). "A trial court's ruling on the admissibility of an expert's testimony constitutes an abuse of discretion where the ruling is manifestly arbitrary, unreasonable, or unfair." *State v. Grubbs,* 353 S.C. 374, 379, 577 S.E.2d 493, 496 (Ct.App.2003).

Cope called Dr. Kassin and sought to qualify him as an expert in social psychology for the purpose of testifying on the phenomenon of false confessions. The State conducted a voir dire of Dr. Kassin and thereafter objected to his qualification, and Cope proffered his testimony outside the presence of the jury. The State objected to Dr. Kassin referencing with specificity any cases where somebody confessed and was later exonerated. Cope asserted the case of *State v. Myers,* 359 S.C. 40, 596 S.E.2d 488 (2004), stands for the proposition that other cases of false confession are admissible if they have a "factual nexus" to the case before the court. However, when asked by the court whether Dr. Kassin would be testifying about any particular case, Cope responded that it was "certainly not [his] plan . . . to call any reference to any specific other case" but that Dr. Kassin would "talk about generally the science that is recognized." The court then stated it would allow him to testify but noted "the witness cannot testify about particular cases unless they are on all fours with this particular case, and you've told me that, pretty much indicated that you don't know of any." Cope responded that he had not and did not intend to ask him about those, but noted there may be cases where certain factors would match the circumstances in Cope's case. The court stated its concern that this would result in a "parade of horribles" before the jury that would be prejudicial and would not serve its function of assisting the jury in its determination of the facts. However, the trial court nevertheless qualified Dr. Kassin as an expert in social psychology with a focus on interrogation and interviews.

Dr. Kassin proceeded to testify before the jury, and began describing types of false confessions, including "coerced compliant" false confessions, where an innocent person might confess in the hope of terminating a bad situation, avoiding some threatened or implied harm, or obtaining leniency or

some reward. In attempting to explain how this could occur, Dr. Kassin mentioned the Central Park jogger case.[7] The State immediately objected and the court sustained the objection based on its previous ruling. The jury was removed and Cope then argued specific examples of other false confessions should be admissible because the field of study was relatively recent and is highly dependent on case studies to properly describe the factors used to show whether a confession is false. The trial court disagreed, noting that it found the prejudice outweighed any probative value, but allowed Dr. Kassin to make another proffer for the record.

In his proffered testimony, Dr. Kassin specifically discussed two cases. One involved Peter Reilly, who found his mother dead and confessed to killing her after being informed he had failed a polygraph test. He was eventually released from prison after exculpatory evidence was found.

The second case involved Gary Gauger, who found his parents slaughtered at home and was extensively interrogated. The police then informed him he failed his polygraph test and he confessed, in some detail, to committing the murders. Later, he was exonerated when a member of a motorcycle gang was caught on tape bragging about the crime. The State objected to specific mention of these cases, and the court held Dr. Kassin should omit discussion of them.

The court of appeals affirmed, noting that "the trial court in this case conscientiously considered the proffered anecdotal evidence before excluding this testimony." *Cope*, 385 S.C. at 289, 684 S.E.2d at 185. The court found Dr. Kassin had been allowed to present exhaustive testimony on the theories underlying the study of coerced internalized false confessions, explain the techniques used by interrogators that can lead to false confessions, and inform the jury that there were "innumerable actual cases" of coerced internalized false confessions. *Id.* at 290, 684 S.E.2d at 185.

---

7. The Central Park jogger case involved the brutal rape and assault of a young woman when she was jogging through New York City's Central Park. Five juveniles were arrested and later confessed as well as implicated one another. The convictions were later vacated in *People v. Wise*, 194 Misc.2d 481, 752 N.Y.S.2d 837, 850 (N.Y.Sup.Ct.2002), when another man confessed to perpetrating the crime alone and DNA evidence corroborated his confession.

Cope contends the trial court should have allowed Dr. Kassin to discuss the specifics of these two cases because they were "nearly identical in many critical respects" to Cope's case. Specifically, Cope notes that the cases involved the same type of "coerced internalized" false confessions that were part of the theory of his defense; Gauger and Reilly were similarly grief-stricken and vulnerable after losing a close relative; both men were also presented with powerful evidence of their guilt; they confessed after being informed they failed a polygraph test; and all three eventually recanted their confessions. He also seeks to distinguish the *Myers* case, which the court of appeals relied upon in its analysis.

In affirming the trial court, the court of appeals relied on *Myers*, which also involved false confession testimony by Dr. Kassin. There, this Court held the trial judge did not err in excluding specific testimony about false confessions in cases from Connecticut and Indiana. *Myers*, 359 S.C. at 50, 596 S.E.2d at 493. The Court noted Dr. Kassin was actually allowed to testify about specific instances of false confessions, including cases where people had confessed in shaken baby cases, and the deaths were later proved to have been caused by some problem other than abuse. *Id.* at 51, 596 S.E.2d at 494. He also discussed cases where defendants confessed to murder, but the victims later turned up alive. *Id.* The Court further noted that "Dr. Kassin did testify about specific cases, he just did not use names or say in which state the crime happened." *Id.* Although the Court acknowledged the Connecticut case was similar to Myers' case, it found the trial court did not abuse its discretion in excluding information about it, noting Dr. Kassin was able to testify at length about false confessions and touch briefly on the Connecticut case. *Id.* Moreover, the Court found that even assuming error by the trial court, Myers could not show prejudice in light of Dr. Kassin's other testimony. *Id.*

Cope argues that *Myers* is distinguishable because the Gauger and Reilly convictions were not merely similar, but were nearly identical in many critical respects. He further argues that Dr. Kassin was not permitted to testify about the Gauger or Reilly cases at all, and therefore the court of appeals erred in affirming the exclusion of the testimony and

in failing to recognize the crucial differences between Cope's case and *Myers*.

Although Cope argues this issue in terms of the similarity of the cases, the trial court's ruling was based primarily on a Rule 403 analysis, noting twice that it found the prejudice outweighed the probative value and expressing some concern about sensationalism. Therefore, even assuming testimony about the Reilly and Gauger cases should have come in because of their similarities, the specifics of those cases were properly excluded as more prejudicial than probative. Presenting the jury with explicit details of historical cases of people who were imprisoned based on false confessions would distract the jury's attention from the facts of this case and potentially confuse the issues. Moreover, *Myers* does not stand for the proposition that testimony regarding substantially similar cases should be allowed in; instead, the Court simply found Myers could not show he was prejudiced by the exclusion of the explicit discussion of similar cases.

 Similarly, although Cope argues his defense was crippled by the exclusion of these specifics, we find no prejudice. The extensive and thorough testimony offered by Dr. Kassin informed the jury of the nature of coerced internalized false confessions and the factors that often accompany such false confessions—such as fatigue, stress, recent trauma, and aggressive police methodology. Furthermore, he noted that this *does* in fact occur and indicated generally that there were a number of cases where people gave detailed confessions which later turned out to be completely false. Although Cope contends the exclusion of these examples hindered his ability to overcome the jury's likely predilection to doubt false confessions happen, his expert was permitted to testify fully that there are a large number of cases where false confessions occurred. We therefore affirm the court of appeals in holding the trial court did not err in excluding the case specifics from Dr. Kassin's testimony.

## IV. DIRECTED VERDICT ON CONSPIRACY

 Lastly, Cope argues the trial court erred in failing to grant his motion for a directed verdict on the conspiracy charge because the evidence presented by the State allowed

only for speculation as to Cope's guilt. We disagree. In reviewing a motion for a directed verdict, the trial judge is concerned with the existence of evidence, not with its weight. *State v. Curtis,* 356 S.C. 622, 633, 591 S.E.2d 600, 605 (2004). In an appeal from the denial of a directed verdict motion, the appellate court must view the evidence in the light most favorable to the State. *Id.* (citing *State v. Burdette,* 335 S.C. 34, 46, 515 S.E.2d 525, 531 (1999)). "If there is any direct evidence or substantial circumstantial evidence reasonably tending to prove the guilt of the accused, the Court must find the case was properly submitted to the jury." *Id.* "Unless there is a total failure of competent evidence as to the charges alleged, refusal by the trial judge to direct a verdict of acquittal is not error." *State v. Arnold,* 361 S.C. 386, 389, 605 S.E.2d 529, 531 (2004).

Criminal conspiracy is defined as a combination between two or more persons for the purpose of accomplishing an unlawful object or a lawful object by unlawful means. S.C.Code Ann. § 16–17–410 (2003). The gravamen of conspiracy is an agreement or combination. *State v. Gunn,* 313 S.C. 124, 134, 437 S.E.2d 75, 80 (1993). "To establish the existence of a conspiracy, proof of an express agreement is not necessary, and direct evidence is not essential, but the conspiracy may be sufficiently shown by circumstantial evidence and the conduct of the parties." *State v. Buckmon,* 347 S.C. 316, 323, 555 S.E.2d 402, 405 (2001). The Court must exercise caution in its analysis, however, to ensure the proof is not obtained "by piling inference upon inference." *Gunn,* 313 S.C. at 134, 437 S.E.2d at 81.

After the State rested, Cope moved for a directed verdict on the conspiracy charge. He argued there was no evidence in the record indicating any conspiracy existed between himself and Sanders, and specifically, no evidence of a meeting of the minds or any agreement between the two men. Cope noted a conspiracy charge cannot be supported by suspicion or conjecture, and the fact there was no evidence of forced entry, combined with the fact Sanders' DNA was found on Child, did not rise to the level of proof of a conspiracy. The trial judge found all the evidence indicated that Cope had been home all night and Sanders was there at some point. He further noted there was evidence the chain on the front door was latched

and that the windows had not been disturbed. He then held there was "some direct and substantial circumstantial evidence" that Sanders and Cope conspired, and therefore denied the motion.

The court of appeals affirmed. It acknowledged the State's case was entirely circumstantial, but stated:

> Nevertheless, in the present case, the DNA evidence on Child's body, along with Cope's admissions about his interactions with Child shortly before she died, place Cope and Sanders together at the time of the assault on Child and her resulting death. Likewise, the testimony regarding lack of forced entry and the cluttered condition of the home constitute evidence that Sanders, who had no known connection with Cope's family, received assistance to navigate his way to Child's bedroom. Finally, Cope's staging of the crime scene after Child died is evidence that a cover-up had begun before Cope called the police to his home on the pretext that Child had accidentally strangled herself, notwithstanding compelling forensic evidence that Sanders was present and actively participating during the same time period in which her death was determined to have occurred. Although each of these factors alone may have supported only a mere suspicion of a conspiracy between Cope and Sanders, it is our view that when considered together, they yield the requisite level of proof of "acts, declarations, or specific conduct" by the alleged conspirators to withstand a directed verdict motion on this charge. *See State v. Hernandez*, 382 S.C. 620, 625, 677 S.E.2d 603, 605 (2009) (reversing a conviction for trafficking and noting "the State failed to present any evidence such as acts, declarations, or specific conduct to support [an] inference" that the petitioners had knowledge that drugs were being transported).

*Cope*, 385 S.C. at 295–96, 684 S.E.2d at 188.

Cope argues the court of appeals erred because the evidence presented by the State of Cope's confessions and suspicious behavior may tend to support the conclusion that Cope was guilty of criminal sexual conduct, but not that he had conspired with Sanders. Cope further points out that to find a conspiracy, the jury must conclude there was an agreement

to commit the crime and commission of the underlying crime is insufficient.

We acknowledge there is no direct evidence that the two men agreed to commit this crime or that they even knew each other. However, conspiracy can be proven by circumstantial evidence and the conduct of the parties. Although Cope criticizes the State's conspiracy charge as unsubstantiated and a desperate attempt to reconcile Cope's confessions with the presence of Sanders' DNA, we fail to find the argument so completely implausible given the State's evidence. There were no signs of forced entry on any of the windows and evidence was presented that the chain on the door had been latched. The house was in such disarray it would have been almost impossible for Sanders to navigate the house in the dark without someone guiding him. Cope confessed to sexually assaulting his daughter on three separate occasions. Furthermore, the bite mark which contained Sanders' saliva was determined to have been inflicted contemporaneously with her other injuries. There was also evidence Child had been cleaned up and dressed after the sexual assault and murder, which Sanders would have been unlikely to do if he risked being caught by someone in the home at any moment. Although the evidence of the existence of an agreement between Sanders and Cope may not be overwhelming, it need not be to survive a directed verdict motion. Viewing the evidence in the light most favorable to the State, we find the evidence would allow a jury to conclude the men conspired to commit these crimes. Competent evidence was admitted which tended to show both men were present with Child around the time of her death and each played some role in the acts that were perpetrated upon her. We find sufficient circumstantial evidence to survive a directed verdict and allow a jury to determine whether an agreement to perpetrate the sexual assault existed between Cope and Sanders. Accordingly, we affirm the court of appeals' affirmance of the trial court's denial of a directed verdict.[8]

---

8. We note that even if we reversed the conspiracy conviction, because Cope is serving that five-year sentence concurrently with his sentence of life plus thirty years' imprisonment, his time incarcerated would not change. Furthermore, while Cope argues that reversal on this ground

## CONCLUSION

We find no reversible error by the trial court and we therefore affirm Cope's convictions.

TOAL, C.J., and BEATTY, J., concur.

KITTREDGE, J., concurring in part and dissenting in part in which PLEICONES, J., concurs.

Justice KITTREDGE.

I fully recognize that, as the majority states, the "facts surrounding the sexual assault and murder of Child are graphic and profoundly disturbing." Notwithstanding my agreement with the majority's characterization of the horrific nature of this tragic crime, I respectfully concur in part and dissent in part. I join the majority in affirming the court of appeals with respect to the conspiracy charge. However, I dissent with respect to two trial court evidentiary errors, which in my judgment require reversal of the court of appeals and remand for a new trial.

## I.

In the early morning hours of November 29, 2001, James Sanders, a serial rapist, entered the home of Petitioner Billy Wayne Cope and brutally raped and murdered Cope's twelve-year-old daughter. Sanders' identity was not known at the time, as the analysis of DNA [9] crime scene evidence, specifically saliva from a bite mark on Child's breast and semen on Child's pants, was not completed for approximately one month.

Initially, and understandably, law enforcement focused on Cope as the sole suspect. Law enforcement assumed the saliva and semen from the crime scene belonged to Cope. Most certainly, Cope's bizarre behavior plausibly supported what turned out to be a false assumption. Although Cope at

would necessitate a new trial on all grounds, his confessions alone would be sufficient to support the CSC and murder convictions.

9. Deoxyribonucleic acid, more commonly known as DNA, is the double-helix structure in cell nuclei that carries the genetic information of living organisms. *Black's Law Dictionary* 550 (9th ed.2009).

first denied any involvement with Child's sexual assault and murder, his behavior was reasonably viewed as suspicious by investigators. Moreover, investigators were unable to find evidence of forced entry into the home. Cope also agreed to take a polygraph examination, which he apparently passed. The examiner, however, informed Cope that he had failed, whereupon Cope's strange series of confessions began. Cope even agreed to return to his home so police could videotape his confession while he purported to reenact the crime.

Cope, for example, stated he "strangl[ed] her with my hands" and believed Child had been "raptured," because he "had just finished reading the *Left Behind* series...." Another confession attributed the attack to "a bad dream about an old girlfriend who had an abortion." According to Cope:

> In my dream she was telling me that I had an abortion with your child and I told her no. I became so enraged that I got out of bed. All I could hear was that laughing sound. I do not know what came over me, but I snapped and I jumped on the bed and straddled [Child]. I hit her in the head and started choking her. I did not know it was my own daughter until after I had shoved the broom stick in her privates. I fell back jarring me to my senses and I realized it was my daughter.

Confident the DNA evidence from the saliva and the semen would point to Cope, police charged Cope with the sexual assault and murder. In short, the police 'had their man.' This preliminary view of Cope as the sole perpetrator was, to be sure, understandable under the circumstances, and it is not my intent to criticize law enforcement for its concentrated focus on Cope. Sometime later, however, the police became aware the DNA evidence obtained from Child was Sanders', not Cope's. This DNA analysis confirming Sanders' guilt unhinged the investigators' reasonable theory that Cope was the sole perpetrator of the horrific crime.

Sanders was then charged in connection with the rape and murder. The State moved forward with the charges against Cope as well, and both men were charged with conspiracy. The State's theory was that "they did it together" with Cope "serv[ing] up his daughter for his and [ ] Sanders' own per-

verse pleasures." Cope and Sanders were tried jointly, and both were convicted and sentenced to life imprisonment.[10]

On direct appeal, the court of appeals initially held the trial court erred in denying Cope's directed verdict motion concerning conspiracy. In its first opinion, the court of appeals found:

> We agree with Cope that the absence of actual proof of an agreement and of some connection between him and Sanders warranted a directed verdict on the conspiracy charge. Here, there was no direct evidence of any association between Cope and Sanders. The State's evidence of a conspiracy was entirely circumstantial, consisting of (1) forensic evidence that the bite mark where Sanders' DNA was found was inflicted within the same two-hour time frame as the injuries that Cope confessed to inflicting, (2) Sister's testimony that she and Child locked the doors before they went to bed and testimony that there was no evidence of forced entry, and (3) the fact that the house was full of debris and passage inside, particularly at night, would have been difficult. These factors, whether considered individually or collectively, raise at most a suspicion that Cope and Sanders intended to act together for their shared mutual benefit. Any inference that they made an agreement to accomplish a shared, single criminal objective would be speculative at best. Therefore, because the State failed to prove the element of agreement for the crime of conspiracy, the trial court should have granted a directed verdict as to that charge.

In a substituted opinion, the court of appeals reversed course and found sufficient evidence of a conspiracy to submit the charge to the jury. The court of appeals also rejected Cope's remaining assignments of error.

## II.

Although a close question is presented, I join the majority in upholding the denial of the directed verdict motion related

---

10. Cope was convicted of murder, two counts of first degree criminal sexual conduct (CSC), criminal conspiracy to commit CSC, and unlawful conduct towards a child. Sanders was convicted of murder, first degree CSC, and criminal conspiracy. The joint trial allowed the State to take, in large part, a bystander role in terms of the critical evidentiary issues, as Sanders carried the State's water in objecting to much of Cope's evidence.

to the conspiracy charge. I would, however, reverse Cope's convictions on two evidentiary grounds, not reach the additional challenges, and remand for a new trial.

## A.

I believe it was unfairly prejudicial to Cope, and thus reversible error, to exclude under Rule 404(b), SCRE, evidence of Sanders' multiple assaults against women, which were committed in the vicinity of Cope's home shortly after the murder of Child. On four occasions between December 12, 2001, and January 12, 2002, Sanders gained entry into residences and either raped or attempted to sexually assault victims ranging in age from nineteen years old to sixty years old. I find the exclusion of this evidence was an abuse of discretion.

Certainly, the admission or exclusion of evidence is committed to the sound discretion of the trial court. *State v. Clasby*, 385 S.C. 148, 154, 682 S.E.2d 892, 895 (2009). However, "the determination of whether the facts surrounding [a sexual] assault sufficiently evidence a common scheme or plan is a question of law." *State v. Tutton*, 354 S.C. 319, 326–27, 580 S.E.2d 186, 190 (Ct.App.2003). In examining the issue, a trial court must exercise its evidentiary discretion in the context of the situation presented, not in a formulaic manner. Similarly, on appeal, a reviewing court must also consider the evidentiary ruling in context. Here, the context that must be considered is a criminal defendant's attempt to present evidence that a co-defendant committed these offenses alone, which was entirely consistent with the co-defendant's practice of committing similar offenses alone. Respectfully, it strikes me that the academic considerations of the majority ignore the reality of the unique facts presented. *See United States v. Rodriguez*, 215 F.3d 110, 120–21 (1st Cir.2000) (noting the similarity of the prior bad act is a factor tending to support admissibility but cautioning that there is no per se rule to determine admissibility; rather admissibility is determined by evaluating the particular facts and legal issues in each case).

More to the point, a myopic approach to matters such as the similarities or lack of similarities between the charged crime and the other crimes serves little purpose in this case. Any

suggested dissimilarities are of no moment, for it is not seriously challenged that Sanders raped and murdered Child and, by clear and convincing evidence, committed the four other crimes. Because it is beyond serious dispute that Sanders committed *all* of the offenses, I see no reason to determine whether the similarities provide a suitable nexus between the other crimes and the charged offense. The relevance of this evidence is unmistakable—Sanders, as a serial rapist, always acted alone.[11]

Even assuming such comparative analysis were required under the circumstances presented, I would find reversible error in any event, for I disagree that there are meaningful dissimilarities between the crime charged and the other crimes. I am unpersuaded by the suggestion that Sanders' other sexual attacks were not sufficiently similar to the rape and murder of the twelve-year-old child. I do not understand why it is so remarkable for a rapist who assaults women ranging from age nineteen to sixty to also assault a twelve-year-old female child. The notion that these acts are "dissimilar" is especially troubling here, where it is clearly established Sanders committed *all* the assaults, including the rape and murder of Child.

And finally, the Court notes the comparative lack of brutality in the other sexual attacks. I disagree, for any differences in the level of brutality were not for lack of trying. Sanders forcibly raped a victim on December 12. On December 16, Sanders physically overpowered another victim, but the victim's screams, a dog barking, and a daughter appearing to see what was wrong led to Sanders fleeing the scene. On December 19, Sanders attempted to overpower a victim by putting a plastic bag over the victim's head and wrapping the victim in a rug; the victim resisted mightily, ultimately grabbing a pen and stabbing Sanders in the leg, causing him to flee. Several weeks later on January 12, Sanders entered another victim's

---

11. With great respect, it appears the majority has permitted the State's "theory" of the case to dictate the admissibility or inadmissibility of a defendant's alleged exculpatory evidence. In my view, by considering only *the State's* theory in the 404(b) analysis, the majority has essentially all but assured Cope, or any other defendant, would be unable to present evidence in his defense when prosecutors cast wide theories of guilt and conspiracy.

residence, shoved the front door against the victim's head and then pushed the victim down, stomping her; the victim resisted and Sanders responded by putting her in a chokehold, from which the victim broke free, only to be thrown down and kicked again; the victim used mace and grabbed a screwdriver from the floor and stabbed Sanders in his left shoulder, causing him to flee. I would not diminish the brutality of these crimes.

I find there is a striking similarity between the facts of this case and the proffered evidence of Sanders' other sexual assaults. All five incidents occurred within a six-week period, and each of the four other incidents occurred within five miles of Cope's home. Moreover, in all five cases, Sanders was a stranger to the victim, yet there were no signs of forced entry to any victim's home. In light of the testimony that the assailant is acquainted with the victim in the vast majority of sexual assault cases,[12] the presence of these two common features is significant. In my view, the other four incidents present a compelling pattern in terms of time, geography and commonality of features—a pattern which is entirely consistent with the facts of this case and material to Cope's theory that Sanders acted alone. *See Butler v. Gamma Nu Chapter of Sigma Chi,* 314 S.C. 477, 480, 445 S.E.2d 468, 470 (1994) (noting that evidence is material if the proffered fact is logically or rationally connected to a disputed fact).

Under the circumstances presented, I would find the exclusion of the evidence of Sanders' other crimes was reversible error, particularly in light of the importance of the proffered evidence to Cope's theory of the case. *See State v. Mizzell,* 349 S.C. 326, 334, 563 S.E.2d 315, 319 (2002) (finding an error is harmless only where "the reviewing court can conclude the error did not contribute to the verdict beyond a reasonable doubt"). I would additionally find the exclusion of Sanders' other crimes violated Cope's due process guarantee of "a

---

12. During the hearing, Gregg McCrary testified as an expert in crime scene analysis. McCrary testified that rape accounts for only 0.8% of all crimes committed and less than 20% of rapes are stranger-based rapes where the assailant is unknown to the victim. McCrary testified that, because stranger-based rapes are "very rare," it would be "very, very unusual" to have "more than one offender committing similar type crimes in a similar area at a similar time."

meaningful opportunity to present a complete defense." *Holmes v. South Carolina,* 547 U.S. 319, 324, 126 S.Ct. 1727, 164 L.Ed.2d 503 (2006).

## B.

I would further hold that the court of appeals erred by affirming the trial court's exclusion of the testimony of James Hill, a fellow inmate of Sanders. Hill purportedly heard Sanders telling another inmate of his rape and murder of "a little girl in Rock Hill." During a proffer, Hill testified he was incarcerated with Sanders in late 2002, when he overheard Sanders talking with another inmate. Sanders joked about how the police were not doing their jobs, and he bragged that it was easy to "delude them." According to Hill, Sanders "made the comment that he was going to get away with what he did to that little girl in Rock Hill." Hill testified that Sanders indicated he had committed oral and anal sodomy on Child, and Sanders claimed he had smothered her. Hill stated Sanders specifically said he "fucked her. He fucked her good[,]" and Sanders claimed he entered and exited the residence though a window.

In objecting to the admission of the testimony, Sanders successfully argued that it was "not relevant to this case because there has been no identifying characteristics," noting that there are many allegations against him. Procedurally, I note that the State did not object to Hill's testimony. Beyond that, Sanders' objection to Hill's testimony was limited to relevance. The majority agrees with me that the trial court's ruling on the relevancy objection was error, for Hill's testimony manifestly meets the threshold of relevancy under Rule 401, SCRE. Clearly, the testimony has some "tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Rule 401, SCRE. Undaunted, and apparently relying on the rule that allows affirmance on any ground appearing in the record, the majority finds an alternative basis to *exclude* Hill's testimony. The majority states that "we nevertheless find it inadmissible as hearsay which would not fall within the proposed exception[,]" specifically Rule 804(b)(3), SCRE. I strongly disagree, and I would not strain to such lengths to sustain the exclusion of

this evidence. There is no plausible deniability as to Sanders' guilt, as he left a bite mark on Child's breast and his semen was found on Child's pants. *See State v. Kinloch,* 338 S.C. 385, 389, 526 S.E.2d 705, 707 (2000) ("The rule does not require that *the information within the statement* be clearly corroborated, it means only that there be corroborating circumstances which clearly indicate the trustworthiness of the statement itself, i.e., that the statement was actually made."). The supposed lack of specificity in Hill's testimony is unavailing, for there is no evidence of another young girl in Rock Hill who was raped and murdered during the same time frame.

Moreover, the majority finds it significant that "there is absolutely no mention of Cope" in Hill's proffered testimony.[13] It seems to me, however, that the *absence* of any reference to Cope in Sanders' alleged jailhouse confession serves to *enhance*, rather than diminish, the statement's relevance and corresponding prejudice to Cope by its exclusion. This is especially evident where Cope expressly sought to refute the claim of a conspiracy with Sanders. Sanders' objection to Hill's testimony was in essence a challenge to the weight of the evidence, not its admissibility. I would find the trial court erred in excluding the testimony of Hill.

Finally, I observe that this is the kind of typical jailhouse confession evidence that is routinely allowed in evidence, with two glaring differences. First, it is almost always the State seeking admission of such evidence. Second, the testifying inmate expects to gain from his assistance to the prosecution. Here, Hill agreed to testify in a situation that he well understood was contrary to the prosecution and thus contrary to his best interest.

### III.

In concurring in part and dissenting in part, I would reverse Cope's convictions and remand for a new trial.

PLEICONES, J., concurs.

---

**13.** Again, I believe it improper for the State's theory of a case alone to control the admissibility or inadmissibility of a co-defendant's exculpatory evidence.